HIAWATHA HOME BUILDERS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74811. Filed June 9, 1961.

*O. A. Brecke, Esq.*, and *J. Robert Nygren, Esq.*, for the petitioner.
*Joseph D. Skinner, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined deficiencies in the income taxes of the petitioner, as follows:

| Fiscal year ended Mar. 31— | Deficiency |
|---|---|
| 1954 | $8, 107. 99 |
| 1955 | 5, 500. 00 |
| 1956 | 5, 500. 00 |

The issues presented for decision are:

(1) Whether there was a "transfer" of property to the petitioner in 1951, within the meaning of that term as used in section 15(c) of the Internal Revenue Code of 1939 and in the cognate provisions of section 1551 of the Internal Revenue Code of 1954.

(2) Whether, if there was such a "transfer" of property, a major purpose thereof was the securing of the surtax exemption provided in section 15(b) of the 1939 Code and in section 11(c) of the 1954 Code, or the securing of the minimum excess profits credit provided in section 431 of the 1939 Code. The excess profits credit phase of this issue has application only to petitioner's first taxable fiscal year ended March 31, 1954, inasmuch as said section 431 was repealed, effective December 31, 1953.

#### FINDINGS OF FACT.

Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference.

The petitioner, Hiawatha Home Builders, Inc., is a corporation organized under the laws of the State of Minnesota, with its principal place of business in Minneapolis, Minnesota. It filed its Federal income tax return for each of the taxable fiscal years ended March 31, 1954, 1955, and 1956, with the district director of internal revenue for the district of Minnesota.

On March 31, 1948, Antonio Favero and five other men [1] formed a Minnesota corporation bearing the name of Minnehaha Terrazzo and Cement Company (hereinafter called Minnehaha).[2] Among the purposes for which Minnehaha was organized were the following, as set out in its articles of incorporation:

To construct and install terrazzo, tile and cement work of all kinds.

To carry on a general construction and contracting business including the designing, construction, installation and erection of buildings, structures, roads, bridges, plants and utilities and the performance of construction work of all types, and to furnish all or any part of the labor, material, equipment and supplies required therefor.

At all times material, the capital stock of Minnehaha was held in equal shares by each of the seven above-named individuals.

---

[1] These five men were: Leo Peschiutta, Dino Corredato, Giordano Stocco, Mario Frasson, and Carlo Corazza.

[2] Shortly after the formation of Minnehaha, a seventh individual, Harry Casagrande, became a stockholder.

Favero and his associates in Minnehaha had, earlier in their lives, been laborers in Italy; and when they came to the United States each of them took up the trade of terrazzo and cement finishing. In the years following the termination of World War II and prior to the organization of Minnehaha, Favero and Peschiutta had plied their trade as partners; and all the others (except Casagrande) were the members of another partnership. The six incorporators decided to conduct a terrazzo- and cement-finishing business in corporate form, principally to avail themselves of the limited liability feature of conducting a business in that fashion. Favero was the president of Minnehaha; and he continued to hold that office throughout the taxable years involved. Favero and each of the other stockholders acted as foremen on the various jobs which Minnehaha contracted to perform.

During the first 2 years of Minnehaha's existence, its business consisted entirely of performing cement and masonry work on building projects, under subcontracts with prime contractors. In the spring of 1950, the directors of Minnehaha decided that the corporation should enter into the housebuilding field on a small scale. At a special meeting of the board on March 8, 1950, the directors took the following action, as reflected in the minutes of such meeting:

The directors then discussed the advisability of undertaking the building of houses. This matter had been considered informally by the directors from time to time and the Board was of the opinion that the Company should acquire a site and build several small houses on an experimental basis to determine whether such work could be handled on a profitable basis.

Pursuant to the foregoing action by the board, Minnehaha proceeded to erect three or four houses during the spring, summer, and early fall of 1950. Thereafter, on November 22, 1950, at another special meeting of Minnehaha's board of directors, the following action was taken, as reflected in the minutes of such meeting:

Mr. Favero submitted a report on the houses which the Company was building covering the cost and the profit made thereon. The Board unanimously approved this report and expressed their satisfaction with the progress made.

Mr. Favero also recommended that the Company undertake the immediate construction of three more houses at First Avenue and 76th Street in order to keep the carpenter crew busy. This action was unanimously approved by the Board.

Early in the following year 1951, a real estate dealer offered to sell to Minnehaha a tract of land containing 43 building lots located in a subdivision known as Crystal Village, for a total consideration of $21,500. The offer was accepted; and Minnehaha entered into a contract for a deed, making a downpayment of $3,000 and leaving $18,500 due under the contract. In addition to the 43 lots in Crystal Village, Minnehaha also purchased approximately 20 other residential building lots in Minneapolis.

The acquisition of the foregoing real properties with the intention of building houses thereon involved Minnehaha in a housing development of major proportions. The corporation was committed to much more extensive housebuilding operations than it had ever been, prior to the acquisition of the Crystal Village lots and the other lots mentioned in the preceding paragraph. Shortly after it had begun the erection of houses on said lots, Favero was approached by construction superintendents of several of the prime contractors for whom Minnehaha was the cement and masonry subcontractor. These superintendents informed Favero that if Minnehaha was going to compete with their firms in housebuilding, then the prime contractors would subcontract their cementwork to some other firm than Minnehaha. When Favero communicated this information to the other stockholders of Minnehaha, they became concerned that Minnehaha's housebuilding activities, if continued, might cost them profitable subcontracts for cementwork. Also, the Minnehaha stockholders believed that housebuilding on a large scale was a risky business; and they were apprehensive that, if any project were unsuccessful, they might lose what they had built up in Minnehaha through their successful and profitable cement and masonry work.

Thereafter, Favero and some of the other stockholders called upon an accountant for his advice as to what should be done with respect to future housebuilding operations, in order to meet the warning of the prime contractors that they would take their business elsewhere, and in order also to allay the stockholders' above-described apprehensions. The accountant suggested the formation of a separate corporation to carry on housebuilding operations and he added that this course would result in tax savings.

Subsequently, on June 22, 1951, at a special meeting of the shareholders of Minnehaha, the following action was taken, as set out in the minutes of said meeting:

The chairman then presented for consideration the proposal which had been made by several of the shareholders that this corporation withdraw from the business of building homes for sale. In discussing this matter it was pointed out that the construction of homes for sale was an essentially different business from that of the cement contracting work in which the company was experienced and required different skills which were hard to obtain. It was also pointed out that the construction of homes required the investment of a large amount of capital, and it was feared that any change in present conditions prevailing in the building industry might result in serious financial loss to the company. It was the consensus of opinion among the shareholders that it was safer and more profitable for this company to confine its business to the cement construction work and stay away from any speculative building. To that end the shareholders unanimously recommended that the directors proceed to close out its home building program and dispose of its houses and lots as soon as that could be done to advantage.

Immediately following the shareholders meeting, a special meeting of the board of directors of Minnehaha was held, at which the following actions were taken, as set out in the minutes of said meeting:

The Board then took up the question of a payment of a dividend at this time. After considering the financial position of the company and its further requirements, it was felt that a cash dividend of $14,000.00 could now be paid; and the following resolution was unanimously adopted:

RESOLVED that a cash dividend of $14,000.00 be paid to the shareholders of record at the date of this meeting in proportion to their respective stock holdings; said dividend to be paid within ninety days.

In accordance with the recommendation made by the shareholders, the directors ordered that no further home building be done and that the officers of the company proceed to dispose of the present houses now completed or under construction as well as any vacant lots heretofore purchased for home building purposes as soon as said properties and houses could be disposed of to good advantage.

The $14,000 dividend authorized by the directors was paid on September 21, 1951.

The petitioner, Hiawatha Home Builders, Inc., was organized on June 20, 1951. Its authorized capital was $25,000, consisting of 500 shares of common stock having a par value of $50 per share. It commenced business later in 1951 with paid-in capital of $21,000 contributed in equal parts by its seven shareholders, who were the same individuals as the shareholders of Minnehaha. Said $21,000 was paid into petitioner's treasury on September 8, 1951. Subsequent financing by petitioner has been through bank loans and loans from its shareholders. No funds have been borrowed from Minnehaha.

In August 1951, Minnehaha sold to petitioner all of the uncompleted houses which it was then in the process of building, as well as all of the vacant building lots in Crystal Village subdivision and elsewhere, which Minnehaha then owned. The purchase price was $62,890.28, plus the assumption by petitioner of Minnehaha's liability of $18,500 on the Crystal Village lots. Said purchase price of $62,890.28 was made up of (1) $48,396.08 for the uncompleted houses, and (2) $14,494.20 for the building lots outside the Crystal Village subdivision (but including Minnehaha's $3,000 downpayment on the Crystal Village lots). The lots and all the labor and materials on the uncompleted houses (with the exception of the cementwork) were sold to petitioner at a price equal to Minnehaha's cost; but the normal rate of profit was added to Minnehaha's cost for the cementwork, and the total of cost plus profit was charged to petitioner for said cementwork. The sale transaction was reflected on Minnehaha's books by an account receivable with petitioner; and on petitioner's books, said transaction was reflected by an account payable with Minnehaha. Petitioner subsequently paid the entire amount of the purchase price to Minnehaha.

After the organization of the petitioner, it operated out of the same office and under the same management as Minnehaha. The latter corporation continued in the cement and masonry business as a subcontractor. Petitioner proceeded to conduct the business of a residential housing contractor; and it hired the necessary workmen, such as carpenters, plumbers, and plasterers, to do its work. Each corporation kept its own separate set of books of account. The petitioner corporation paid Favero a salary each year for management and supervision; but it paid no other compensation to him or its other officers as such.

During the taxable years here involved, Minnehaha performed all of the cementwork which the petitioner required on its housebuilding operations. There were no written contracts between Minnehaha and petitioner relating to this work; but Minnehaha rarely entered into written contracts with any of the firms with which it did business.

The gross profits and gross sales of the petitioner and of Minnehaha for each of the fiscal years ended March 31, 1951 through 1956, were as follows:

| Fiscal year ended Mar. 31— | Gross sales | | Gross profits | |
|---|---|---|---|---|
| | Petitioner | Minnehaha | Petitioner | Minnehaha |
| 1951 | (1) | $377,155.35 | (1) | $54,649.64 |
| 1952 | $100,001.70 | 466,194.92 | $10,987.28 | 16,601.87 |
| 1953 | 213,048.00 | 345,901.29 | 16,342.10 | 62,420.65 |
| 1954 | 327,802.33 | 300,148.85 | 32,256.25 | 31,636.93 |
| 1955 | 267,516.74 | 435,774.45 | 42,972.01 | 54,102.07 |
| 1956 | 379,566.58 | 425,235.96 | 39,364.31 | (2) |

¹ Not in existence.
² Not shown in record.

Minnehaha's gross profits for its fiscal years ended March 31, 1951 and 1952, were composed of profits from its cement subcontracting work and its housebuilding activities, in the following amounts:

| | Fiscal year ended Mar. 31— | |
|---|---|---|
| | 1951 | 1952 |
| Cement subcontracting | $48,015.38 | $11,987.19 |
| Housebuilding | 6,634.26 | 4,614.68 |
| Total | 54,649.64 | 16,601.87 |

The petitioner corporation, in computing its Federal income tax liability for each of the taxable years involved, claimed a surtax exemption provided by section 15(b) of the 1939 Code or section 11(c) of the 1954 Code, depending upon which of these Codes applied to a particular taxable year. Also on its return for the fiscal year ended March 31, 1954, petitioner availed itself of the minimum excess profits credit provided by section 431 of the 1939 Code, in computing its tax liability for said year.

The respondent, in his statutory notice of deficiency, determined under section 15(c) of the 1939 Code and section 1551 of the 1954 Code, that petitioner was not entitled to the benefits of the above-mentioned surtax exemptions or of the minimum excess profits credit.

## ULTIMATE FINDING.

The transfer of properties to the petitioner corporation by Minnehaha in 1951 was not made with a major purpose of securing exemption from surtax or minimum excess profits credit for the petitioner.

## OPINION.

## I.

The first issue is framed by petitioner's contention that the sale transaction whereby it acquired uncompleted houses and vacant building lots from Minnehaha, was not a "transfer" of property, within the meaning of that term as used in section 15(c) of the 1939 Code and in the cognate section 1551 of the 1954 Code.[3]

Petitioner presents a two-ply argument in support of its contention: First, it argues that the only type of transaction embraced within the term "transfer" as used in the statute, is an *exchange* of assets for stock or other securities; and, that no transfer of such character is involved in the instant case—but rather a *sale* of assets by Minnehaha to petitioner. Second, petitioner argues that it was not formed for the purpose of acquiring the houses and lots from Minnehaha; but, rather, for the much larger purpose of conducting housebuilding operations on a greatly expanded scale, to which larger purpose the acquisition of such houses and lots was a mere incident. Neither of these arguments, in our view, is meritorious.

Inspection of section 1551 reveals that it uses the verb "transfers" and the noun "transfer" without limitations of any kind; and we

---

[3] Section 15(c) of the 1939 Code and section 1551 of the 1954 Code are substantially similar in all respects necessary for a consideration of both of the issues presented in the instant case. For convenience, we shall hereinafter refer only to section 1551, the provisions of which are as follows:

SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT.

If any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or which was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year (except as may be otherwise determined under section 269(b)) be allowed either the $25,000 exemption from surtax provided in section 11(c) * * *, unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. For purposes of this section, control means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of the corporation. * * *

believe that this evinces a congressional intent to cover any transfer of property—including a sale of property. See and compare *Theatre Concessions, Inc.*, 29 T.C. 754, 758. Also, in *Coastal Oil Storage Co.*, 25 T.C. 1304, affirmed without discussion of this issue 242 F. 2d 396 (C.A. 4), we found as a fact that the transferor "sold" property to the taxpayer transferee; and, without discussion of the point, we held that there had been a transfer of property sufficient to satisfy the statute there involved, section 15(c) of the 1939 Code.

Moreover, it is to be observed that Congress specifically excepted transfers of money from the operation of section 1551. This indicates to us that if Congress had intended to except any further transfers, it would have spelled out the exceptions. *Inclusio unius est exclusio alterius.*

Turning to the second argument advanced by petitioner, as set forth above, we think it obvious—and indeed petitioner does not appear to contend otherwise—that at least one of the purposes of the creation of the petitioner was to acquire the uncompleted houses and the vacant lots then owned by Minnehaha. That is sufficient, we believe, to bring section 1551 into play. It seems obvious that in almost every case where there is a transfer of properties, there is also a purpose to conduct a continuing business through use of the newly created corporation. But if we were to accept petitioner's argument that a mere purpose to conduct a continuing business makes the statute inapplicable, then such purpose to conduct a continuing business could effectively prevent application of section 1551 in almost every case. We are satisfied that Congress never intended the purpose of the statute to be thus thwarted.

We hold that the transfer of the houses and lots to petitioner by Minnehaha was a transaction within the ambit of section 1551. We thus pass the threshold, and proceed to the second issue.

## II.

The second issue is whether the petitioner has established "by the clear preponderance of the evidence" that a major purpose of the transfer mentioned and described in the first issue, *supra*, was *not* to secure the surtax exemption or the minimum excess profits credit. The issue is one of fact, to be determined upon a consideration of all the circumstances relevant to the transfer. *Truck Terminals, Inc.*, 33 T.C. 876, 884; *Sno-Frost, Inc.*, 31 T.C. 1058, 1062, acq. 1959–2 C.B. 7; Income Tax Regs., sec. 1.1551–1(e).

The interdicted purpose of securing the surtax exemption need not be the sole or principal purpose of the transfer of property. Rather, the benefit of the exemption is to be disallowed if such purpose was a

major purpose. *Truck Terminals, Inc., supra.* Nor will a mere showing of a business need as actuating the transfer suffice to satisfy a taxpayer's burden of proof under section 1551. In a word, the taxpayer has the burden of establishing a negative proposition, i.e., that the securing of the surtax exemption or the minimum excess profits credit was not a major purpose of the transfer.

Applying the foregoing criteria to the facts established by the record in the instant case, we are satisfied, and have accordingly found as an ultimate fact, that the transfer from Minnehaha to petitioner was not made with a major purpose of securing the surtax exemption or the minimum excess profits credit. In our appraisal of the facts, we are convinced that petitioner was formed to conduct greatly expanded housebuilding operations, which were then being contemplated and which entailed possibly great financial risks—against which the stockholders of Minnehaha desired to shield themselves and Minnehaha, through the creation of a separate corporation (the petitioner). Also, there was the purpose to avert the threatened loss of cement subcontracting business, which was in prospect if Minnehaha continued to compete with its building contractor customers. To be sure, the accountant adviser who suggested the formation of petitioner pointed out that its creation would result in tax savings. But we are persuaded that the securing of such tax savings was not a major purpose of the creation of petitioner; and that such corporation would have been formed, irrespective of whether tax savings would have resulted.

The conclusion which we have reached accords with what appears from the legislative history of section 15(c) of the 1939 Code, the predecessor of section 1551 of the 1954 Code, to have been the congressional purpose of enacting these provisions. The Senate Committee on Finance stated that one of the "traditional and legitimate" purposes for the formation of a new and separate corporation, was to limit liability "with respect to the development of a new and risky enterprise." S. Rept. No. 781, 82d Cong., 1st Sess., 1951–2 C.B. 458, 506–507. And, in the Joint Committee Staff Summary of Provisions of the Revenue Act of 1951, the following is stated with respect to the purpose of the provision of the 1951 Act which added section 15(c) to the 1939 Code:

This provision of the bill does not prohibit or discourage expansion of an existing business accompanied by the formation of new corporations, as distinguished from the mere split-up of an existing business * * *. [1951–2 C.B. 287, 303.]

We decide this issue for the petitioner.

*Decision will be entered for the petitioner.*