NEW ENGLAND FOUNDRY CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3535–63. Filed May 5, 1965.

*Burton L. Williams*, for the petitioner.
*Robert B. Dugan*, for the respondent.

TURNER, *Judge:* Section 1551 of the 1954 Code, which is the governing statute in this case, provided as follows during the years in question:

SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT.

If any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or which was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year (except as may be otherwise determined under section 269(b)) be allowed either the $25,000 exemption from surtax provided in section 11(c) or the $100,000 accumulated earnings credit provided in paragraph (2) or (3) of section 535(c), unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. For purposes of this section, control means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of the corporation. In determining the ownership of stock for the purpose of this section, the ownership of stock shall be determined in accordance with the provisions of section 544, except that constructive ownership under section 544(a)(2) shall be determined only with respect to the individual's spouse and minor children. The provisions of section 269(b), and the authority of the Secretary under such section, shall, to the extent not inconsistent with the provisions of this section, be applicable to this section.

Income Tax Regulations, sec. 1.1551-1(e), provides as follows:

Sec. 1.1551-1 Disallowance of surtax exemption and accumulated earnings credit.

(e) Purpose of transfer. In determining, for the purpose of section 1551, whether the securing of the exemption from surtax or the accumulated earnings credit constituted "a major purpose" of the transfer, all circumstances relevant to the transfer shall be considered. For disallowance of the surtax exemption and accumulated earnings credit under section 1551, it is not necessary that the obtaining of either such credit or exemption or both have been the sole or principal purpose of the transfer of the property. It is sufficient if it appears, in the light of all the facts and circumstances, that the obtaining of such exemption or credit, or both, was one of the major considerations that prompted the transfer. Thus, the securing of the surtax exemption or the accumulated earnings credit may constitute "a major purpose" of the transfer, notwithstanding that such transfer was effected for a valid business purpose and qualified as a reorganization within the meaning of section 368. The taxpayer's burden of establishing by the clear preponderance of the evidence that the securing of either such exemption or credit or both was not "a major purpose" of the transfer may be met, for example, by a showing that the obtaining of such exemption, or credit, or both, was not a major factor in relationship to the other consideration or considerations which prompted the transfer.

The facts show that the sale of property to the petitioner by Watts was motivated by a number of purposes. Among them were increased production and efficiency, the elimination of a difficult intraplant labor problem with which Watts had been plagued and which it had not been possible to resolve, the generation of sufficient local financial credit through the creation of a new borrower as a result of incorporation, and the solution of specialized marketing problems through the medium of a separate corporate entity. Not only do the facts fail to persuade us that the securing of an additional surtax exemption was a major purpose of the transfer, but to the contrary the evidence convinces us that it was not. We have so found.

That the transaction here was a transaction dealt with in section 1551 is not disputed. Here there was a transfer of property to a transferee corporation which was formed to acquire said property and the transferee corporation was controlled by the shareholders of the transferor corporation. Nor is there any dispute in fact or law that the "sale" in the instant case is a "transfer" within the meaning of the statute. *Hiawatha Home Builders, Inc.*, 36 T.C. 491 (1961).

Once the requirements of the statute have been met, the remaining issue is one of fact and the petitioner has the burden of showing by a clear preponderance of the evidence that the securing of an exemption was not a major purpose for the transfer in question.

The facts show and respondent does not seriously dispute that Watts was in need of considerably more foundry production. In addition, it is clear from the facts that a serious labor problem stood in the way of efficient foundry operations so long as the foundry was owned and operated by Watts. Experience had established that this problem could not be resolved so long as Watts undertook to do its own casting and it and its foundry workers were required to deal with their work and employment problems through a single shopwide bargaining committee.

A time-study program could not feasibly be instituted and the elimination of plantwide "bumping" could not be accomplished while the foundry workers were subject to a single plantwide labor contract. A separate, incorporated foundry with its own union contract was Watts' solution to these problems. In view of the uncontroverted facts in the record, we think the incorporation of the new foundry and the resulting division of the existing union into two separate bargaining units by the creation of a separate employer for the foundry workers was a good commonsense solution to the problem. See *Cronstroms Manufacturing, Inc.*, 36 T.C. 500 (1961).

Respondent argues that arrangements for a separate bargaining unit other than the incorporation of petitioner were available at the end of the various contract periods but this is not sustained by the record. The uncontradicted testimony of witness Gates was that the machinists

dominated the union, that no contract distinction was drawn between the respective arts of machining and casting, and that Watts negotiated and renegotiated at the end of each contract period for effective operative changes under the contract but without success.

Another moving purpose for the organization of petitioner was that of financing the new foundry. Watts had done practically all of its banking with Arlington Trust but its lending limit to any one borrower was $300,000, which in this instance would not have permitted Watts to expand its borrowing to the extent necessary. Respondent seeks to discount the financing problem as a major purpose for organizing petitioner, arguing that it is far from clear that the possibilities of financing other than by organization of a separate corporation had been exhausted. He stresses Gates' testimony that only two local banks were contacted and Horne's testimony regarding what appears to be "general" financial nogotiations with a single Boston bank. The record shows that the Bay State Merchants Bank, the only other local bank in Lawrence at the time of the transaction, had been contacted. Furthermore, Watts was not a stranger to the difficulties attendant upon negotiations for outside financing. The record does not, it is true, supply the details of the negotiations with the Boston bank, but it does show that lengthy negotiations did take place and that they were abandoned because of the regulations and financial red tape involved. See and compare *Bush Hog Manufacturing Co.*, 42 T.C. 713 (1964), wherein the credit limit of the bank to each borrower was $60,000.

The record indicates that the valve industry is involved with rather specialized problems and that its attendant market has some peculiar facets. For example, the uncontroverted testimony of record indicates that the relationship and lines of distribution between a supplier of the standing of Watts and its principal classes of customers might seriously be affected if it were known that the facility and know-how of Watts should be equally available to mail-order houses and the like. These latter groups marketed products under their own brand names which were in competition with the established customers of Watts, such as plumbing and heating wholesalers and original equipment manufacturers. This was a major purpose for the setting up of Webster Valve Corp. sometime in 1955 or 1956. Webster produces a rival but less expensive line of products than Watts and is utilized primarily as a vehicle for making sales to mail-order houses on a name-brand-account basis. Watts has never made any sales to mail-order houses and its company policy to this effect was engendered by the above-described competitive situation existing between the mail-order houses and its principal classes of customers.

The record shows that at all times pertinent Horne was the real party in interest to the transactions of concern here. And while Gates

and Sherman did participate in the discussions and planning which led to the organization of petitioner, it was Horne's approval which made the decisions final. It was his testimony that the procuring of a surtax exemption was not a moving factor in the decisions made and we are fully satisfied that such was the case.

It is our opinion that petitioner has carried its burden of showing by a clear preponderance of the evidence that the securing of a surtax exemption was not a major purpose of the transfer at issue herein. We so conclude and hold.

*Decision will be entered under Rule 50.*