Middle States Terminals, Inc. v. Commissioner.
Middle States Terminals, Inc. v. Commissioner
Docket No. 958-65.
United States Tax Court
T.C. Memo 1966-32; 1966 Tax Ct. Memo LEXIS 250; 25 T.C.M. (CCH) 203; T.C.M. (RIA) 66032; February 17, 1966
*250 An Ohio truck terminal corporation with a single stockholder owned a terminal in Cincinnati and a partially constructed terminal in Chicago. It sold its Chicago terminal property to petitioner, an Illinois corporation created by the same single stockholder to borrow money and buy the Chicago terminal property. The evidence showed the formation of petitioner to acquire and finance the Chicago truck terminal was a prerequisite to the bank's granting the loan. Held, petitioner sustained its burden of showing that securing the surtax exemption was not a major purpose of such transfer within section 1551, I.R.C. of 1954, and evasion or avoidance of tax was not the principal purpose of forming the new corporation under section 269, I.R.C. of 1954. George W. Weber, Jr., 700 Atlas Bank Bldg., Cincinnati, Ohio, for the petitioner. Rodney G. Haworth, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent *251 determined deficiencies in petitioner's income tax for 1961 and 1962 in the respective amounts of $2,143.57 and $2,415.32. The only issue is whether petitioner should be denied the surtax exemption provided for in section 11, Internal Revenue Code of 1954 because of the provisions of section 269 or 1551 of the Internal Revenue Code of 1954. n4. [1]
*252 Findings of Fact Some of the facts were stipulated and they are so found. Middle States Terminals, Inc. is an Illinois corporation organized on April 17, 1960, whose address is 5723 Este Avenue, Cincinnati, Ohio. It filed its Federal corporation income tax returns for 1961 and 1962 with the district director of internal revenue at Cincinnati, Ohio. In March 1950 Charles L. Peterson acquired all of the capital stock of Middle States Motor Freight, Inc., a common carrier. On July 30, 1958 C. L. Peterson Terminals, Inc. was incorporated as an Ohio corporation. During the period here relevant, Charles L. Peterson owned all of the outstanding capital stock of petitioner and C. L. Peterson Terminals, Inc. In 1958 and some few years prior thereto, Middle States Motor Freight, Inc. rented trucking terminal space in Chicago, Illinois and Cincinnati, Ohio. Due to urban renewal programs, both terminal sites became subject to condemnation at about the same time. At that time (early in 1958) it appeared that the condemnation proceedings were more imminent in the Chicago area and, consequently, Peterson concentrated on a search for a terminal site in Chicago. Property for a terminal site *253 was found in Melrose Park, a suburb of Chicago, and this property was deeded to C. L. Peterson Terminals, Inc. (which had been incorporated in July 1958) in August 1958. C. L. Peterson Terminals, Inc. made a cash down payment of $15,000 on the property. It then became apparent that it would be necessary to give precedence to the construction of a new terminal in Cincinnati. Charles L. Peterson consulted Val E. Boeh, an executive and one of the chief lending officers of The Central Trust Company of Cincinnati, to obtain financing for the construction of a new terminal in Cincinnati. Boeh was reluctant to go into terminal financing and after unsuccessful attempts to assist Peterson in obtaining loans from other sources, Boeh finally agreed to make a loan for the construction of a terminal in Cincinnati. Boeh indicated that one of the conditions for this loan was that the new terminal should be held by a separate entity apart from Middle States Motor Freight, Inc. C. L. Peterson, Inc. purchased land in Cincinnati to be used as a site for the construction of a terminal to be leased to Middle States Motor Freight, Inc. For the purchase of the Cincinnati property and construction of *254 the terminal, C. L. Peterson Terminals, Inc. obtained a loan from The Central Trust Company with Charles L. Peterson as guarantor. As additional collateral for the loan, The Central Trust Company took a mortgage on the property and also received an assignment of the rental income. In August 1959, C. L. Peterson Terminals, Inc. commenced the construction of a terminal on the Melrose Park property and by May 1960 had paid a total amount of $122,000 to the general contractor. C. L. Peterson Terminals, Inc. obtained this amount through additional loans from The Central Trust Company which was guaranteed by Charles L. Peterson. These loans were generally made on a short-term basis. But before The Central Trust Company would agree to any permanent financing of the Chicago terminal on a long-term basis, it required that the title to the terminal should be placed in a separate entity apart from both Middle States Motor Freight, Inc. and C. L. Peterson Terminals, Inc. On May 20, 1960 petitioner (which had been formed on April 17, 1960) purchased the Melrose Park terminal property from C. L. Peterson Terminals, Inc., which terminal property included the land at a cost of $104,400.75 (its *255 cost to C. L. Peterson Terminals, Inc.) and the terminal building for $122,000. Petitioner completed construction of the building, and the total cost of the building as reflected on petitioner's balance sheet, including the expenses incurred by petitioner, was as follows: Date
Amount
May 31, 1960
$122,000.00
June 30, 1960
6,525.00
July 31, 1960
16,893.72
Total
$145,418.72
Petitioner obtained a loan from The Central Trust Company in the amount of $240,000 and executed its promissory note (dated June 15, 1960) in that amount payable in monthly installments over a period of about seven or eight years with interest at 5 3/4 percent per annum. As additional security for the loan petitioner assigned its rental income to The Central Trust Company and also gave The Central Trust Company a real estate mortgage. In addition, Charles L. Peterson and his wife guaranteed the payment of the note. With the proceeds of the loan petitioner paid $226,400.75 to C. L. Peterson Terminals, Inc. for the acquisition of the land and partially completed terminal in Melrose Park, Illinois. During the period here relevant C. L. Peterson Terminals, Inc. rented terminal space (which *256 it owned) to Middle States Motor Freight, Inc. in Colfax, Indiana as well as in Cincinnati, Ohio. Middle States Motor Freight, Inc. paid rent to petitioner for the use of Melrose Park, Illinois property in the amount of $21,000 for the period from June 1, 1960 through December 31, 1960 and $36,000 for each of the years 1961 and 1962. Respondent, in his statutory notice of deficiency, determined that "the exemption from surtax provided in section 11(c) of the Internal Revenue Code is to be allocated between [petitioner] and C. L. Peterson Terminals, Inc., in accordance with sections 269 and/or 1551 of the Internal Revenue Code." Respondent further determined that "the surtax exemption applies first to the net income of C. L. Peterson Terminals, Inc., and the remaining balance is then allowable to [petitioner]." Respondent allowed a portion of the surtax exemption to petitioner in 1961 and 1962 under the authorization granted by sections 269(b) and 1551(c). Opinion Section 1551, as here applicable, provides that where a corporation transfers all or a part of its property (other than money) to another corporation which was created *257 for the purpose of acquiring such property or was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders are in control of the transferee corporation (at least 80 percent of the stock), then the transferee corporation will not be allowed the $25,000 surtax exemption provided for in section 11 unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption was not a major purpose of such transfer. Petitioner argues that the sale of the terminal property by C. L. Peterson Terminals, Inc. to petitioner in 1960 was not a "transfer" within the meaning of section 1551 before that section was amended by section 235(b) of the Revenue Act of 1964 to cover certain indirect as well as direct transfers of property. We have held that a sale of property can be treated as a transfer under section 1551 even before the amendment. New England Foundry Corp., 44 T.C. 150, and Hiawatha Home Bui3de9s, Inc., 36 T.C. 491. It is clear that the surtax exemption will be disallowed under section 1551 if the interdicted purpose of *258 obtaining such surtax exemption was a major purpose of the transfer. It need not be the sole or principal purpose of the transfer. As we stated in Bush Hog Manufacturing Co., 42 T.C. 713, "[the] taxpayer has the burden of establishing a negative proposition, i.e., that the securing of the surtax exemption was not a major purpose of the transfer." We believe petitioner has met its burden on this issue. The evidence convincingly shows that the transfer of the partially completed terminal property in 1960 from C. L. Peterson Terminals, Inc. was a prerequisite to obtaining long-term financing for the newly-acquired terminal. By May 1960 C. L. Peterson Terminals, Inc. (controlled by Peterson) had paid $122,000 for construction of the Melrose Park Terminal and had borrowed this amount from The Central Trust Company by a series of short-term loans. When Peterson sought more permanent long-term financing, he was informed by Boeh, a senior vice-president and one of the chief lending officers of the bank, that as a prerequisite to the loan, a separate corporation apart from both Middle States Motor Freight, Inc. and C. L. Peterson Terminals, Inc. would have to be formed to take *259 title to the terminal property. Peterson testified that Boeh told him, after he (Boeh) had taken the matter up with the bank's board of directors, that it was a prerequisite to the granting of the loan, that he set up a separate corporation. Boeh also testified at the trial. He was generally familiar with Peterson's operations over the years and it had been one of the conditions of a previous loan by The Central Trust Company to finance the acquisition and construction of a new terminal in Cincinnati that the new terminal should be held by a separate entity apart from Middle States Motor Freight, Inc. (controlled by Peterson), and this condition was met by placing the ownership of the Cincinnati terminal in C. L. Peterson Terminals, Inc. [2] As to the proposed long-term loan on the Melrose Park terminal, Boeh testified that "again it was a condition of the granting of the loan that this also be done as a separate entity" and he later clarified this by saying that "we meant separate and apart from any other corporation." *260 Boeh also gave reasons for the bank's insistence that the Melrose Park terminal should be held by a separate entity apart from both Middle States Motor Freight, Inc. and C. L. Peterson Terminals, Inc. He testified that "[Middle States Motor Freight, Inc.] was rather topheavy in debt" and "[we] determined it wouldn't be good business to obligate the Motor Freight Company with this debt." Boeh also indicated that if the Cincinnati and Melrose Park terminals were held by separate entities, it would be easier to proceed against the separately held property in the event either of the terminals got into financial difficulties. We are convinced on this record that the only reason for transferring the Melrose Park property to petitioner was to meet the bank's requirements for granting long-term financing. There is no evidence to indicate that the securing of additional surtax exemptions or other tax benefit played any role in the decision to make the transfer to petitioner. We believe that petitioner has shown by a clear preponderance of the evidence that the securing of a surtax exemption was not a major purpose of the transfer within the meaning of section 1551, and we so hold. *261 Respondent also relies upon section 269[3] to disallow the full surtax exemption to petitioner. Under section 269 the petitioner must show that the evasion or avoidance of tax was not the "principal purpose" of forming the new corporation, i.e., petitioner, in order to hold the terminal property in Melrose Park. We conclude, for the same reasons discussed above under section 1551, that the evasion or avoidance of tax by securing the added surtax exemption was not the principal purpose in forming petitioner, and we hold that section 269 is not applicable under the facts of this case. Decision will be entered for the petitioner. Footnotes
1. All section references will be to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. There is evidence to show that The Central Trust Company was at first reluctant to go into "terminal financing" and that it was only after Peterson had been unable to get financing from other sources that the bank agreed to consider the loan.↩
3. Section 269↩ provides, in part, that if "any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy", then such deduction, credit, or other allowance shall not be allowed.