SNO-FROST, INC., AN OHIO CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66048. Filed February 27, 1959.

*M. R. Schlesinger, Esq.*, and *C. W. Landefeld, Esq.*, for the petitioner.

*William O. Allen, Esq.*, for the respondent.

WITHEY, *Judge:* Deficiencies in income tax for 1953 and 1954 have been determined by respondent against petitioner in the respective amounts of $9,688.81 and $5,500. The issue presented by the pleadings is whether the respondent has erred in disallowing for 1953 a surtax exemption and a minimum excess profits credit to petitioner under section 15 (c) of the Internal Revenue Code of 1939 and in disallowing for 1954 a surtax exemption and an accumulated earnings credit under section 1551 of the Internal Revenue Code of 1954.

FINDINGS OF FACT.

The facts which have been stipulated are so found.

Petitioner duly and timely filed its Federal income tax and excess profits tax returns for its taxable years ended December 31, 1953 and 1954, with the district director of internal revenue for the district of Cleveland, Ohio.

Petitioner is a wholly owned subsidiary of Superior Provision Company, an Ohio corporation, with its home office and principal place of business at Massillon, Ohio. Petitioner will hereinafter be referred to as Snow Frost. Snow Frost was incorporated by Superior on or about December 31, 1952, and on March 26, 1953, received from Superior all of that concern's frozen food business and assets appurtenant thereto. Prior to the latter date and at all times here material Superior had been a meat processor and wholesale distributor with a franchise for the wholesale distribution in the Massillon, Canton, Youngstown, and surrounding areas of Ohio of the frozen food products of Snow Crop Marketers Division of Clinton Foods, Inc., hereinafter designated Snow Crop.

Snow Crop was a processor and packager of frozen foods and distributed them for sale partly through franchised distributors on a nationwide basis. It had franchised Superior to sell its goods at wholesale in the early part of 1951. At a company meeting held in Michigan in 1949 Snow Crop had announced a company policy to the effect that franchises would henceforth be granted to distributors who, in case they were in a different line of business, would agree to establish a separate business entity to operate under a Snow Crop franchise. However, due to the fact that its then franchise holder in the Massillon area was in serious financial difficulty and about to go bankrupt, in negotiating with Superior relative to its taking over that franchise, Snow Crop did not insist upon the immediate creation of petitioner,

but merely recommended such a course at Superior's earliest convenience. Approximately 2 years and 3 months then elapsed before petitioner was incorporated. In the meantime, upon repeated occasions, Snow Crop through personal oral contacts between its officers and managerial employees and those of Superior made requests that a separate corporation be created for the operation of the franchise. Superior had consulted its attorney with respect to the matter. It was prepared either to create a separate corporation or categorically to refuse to do so depending upon the attorney's advice. In conferences respecting the problem the attorney, who was a general practitioner and not a so-called tax specialist, expressed concern over a possible tax disadvantage to Superior resulting from what he termed a "split-off" or "spin-off" if the separate corporation was formed. The attorney was elderly and deliberate and considerable time elapsed during his study of the problem. Before rendering his final opinion he suffered a heart attack and more time passed during his convalescence. Prior to the rendering of its attorney's final opinion Superior was informed by Snow Crop that unless the separate corporation was formed forthwith, Snow Crop would consider the cancellation of its franchise which by that time had become valuable to Superior. After Superior's attorney had recuperated, several additional months passed before petitioner was finally created.

The business of processing and wholesale selling of meats at the time Superior became a franchise holder of Snow Crop involved less risk in some respects than the wholesale distribution of frozen foods. Inherently, while meats could be stored and handled at temperatures above the freezing point, frozen foods required storing and handling at temperatures below that point, thus requiring somewhat different storing and trucking equipment. While meats were delivered to retailers on an immediate sale basis, frozen foods, particularly during the period when Superior was developing a market for them, were often consigned to retailers on a basis which permitted the retailer to pay for the delivered merchandise at the time and only in the event it was sold. Any merchandise which was damaged or its packaging disarranged or spoiled or which remained unsold was returned to Superior and discarded. Ninety per cent of returned meats, on the other hand, could be salvaged and resold. Involved in Superior's frozen food business were the purchase from the manufacturer and the sale to retailers of frozen food cabinets and showcases. Although such purchases and sales were financed by Superior through its assignment of the retailers' chattel mortgages to the Chase National Bank of New York, such assignments were with full recourse. Snow Crop required that its distributors police the retailers' use of the cabinets

so that foods other than Snow Crop's would not be stored and displayed in them.

Aside from Snow Crop's insistence upon the creation of petitioner, Superior's reasons for so doing were the risk of a new enterprise as above described to the welfare of its parent; the fact that meats as distinguished from frozen foods required different merchandising methods which, in turn, entailed a different treatment of accounts; the fact that both corporations were intended to establish independent pension plans for their respective employees; the fact that Snow Crop rather than its franchise holder controlled pricing and sales policies and production which was a new and untried business factor in Superior's experience; and a not insignificant reason was that Superior did not wish to risk an impairment of the credit of its meat business through credit commitments relating solely to the operation of petitioner. The factual basis for all of these reasons is supported by the record and is found to exist in fact. We also find that another reason for petitioner's creation was the fact that, assuming it could show by a clear preponderance of evidence that a major reason for its creation was not the securing of a surtax exemption or an excess profits tax credit, it would secure such exemption and credit in appropriate tax years.

The only major reason for petitioner's formation was the insistence of Snow Crop coupled with Superior's desire to retain its Snow Crop franchise.

Superior's purpose to secure the surtax credit provided by section 15(b) of the 1939 Code, the excess profits tax credit provided in the last sentence of section 431 of the 1939 Code, the surtax exemption provided by section 11(c) of the 1954 Code, or the accumulated earnings credit provided by section 535(c)(2) or (3) of the 1954 Code, was not a major purpose for its creation of petitioner.

### OPINION.

Even though the issue before us for decision is framed by the language of sections 15(c) of the 1939 Code [1] and 1551 of the 1954

---

[1] SEC. 15. SURTAX ON CORPORATIONS.

(c) DISALLOWANCE OF SURTAX EXEMPTION AND MINIMUM EXCESS PROFITS CREDIT.— If any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or which was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year (except as may be otherwise determined under section 129(b)) be allowed either the $25,000 exemption from surtax provided in subsection (b) or the $25,000 minimum excess profits credit provided in the last sentence of section 431, unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. * * *

Code,[2] we nevertheless find the issue to be one of fact and not of law. Inasmuch as neither section defines "major purpose," we take the phrase to convey only its ordinarily accepted meaning and not to be a term of art.

Our ultimate finding of fact is dispositive of the entire issue. We have been led to this conclusion largely because facts supporting it were adduced through the testimony of two independent and, so far as the record discloses, completely disinterested witnesses who were, at a time prior to petitioner's inception, sales managers of Snow Crop, but who have long since severed their respective relationships with that company. Their testimony is entirely worthy of credence and is uncontradicted herein except possibly by inference. On the other hand, it is supported strongly by inference to the opposite effect. We will discuss the latter inference first.

Having found as a fact that Snow Crop had at the time of granting its franchise to Superior requested that operations under the franchise be carried on through a separate business entity and that such request strengthened to a demand and threat to consider the cancellation of the franchise unless complied with, it seems to us that Superior's failure so to comply for about 2 years and 3 months could be accounted for only by the absence of a desire to secure the tax advantages which would inure to a separate corporation including those here in controversy. The surtax exemption and excess profits tax credit provisions here involved were extant at the time Superior acquired a Snow Crop franchise when it was first requested to create a separate corporation to distribute frozen foods. It seems incredible that, assuming such a desire, Superior would have been at all hesitant in so doing. It is true, as we have found, that when petitioner was finally formed, it fully intended to take advantage of any tax benefits to which it was entitled under the law, including those involved here, but this is not to say that such an intention is to be given the stature of a major purpose.

Respondent's case was largely tried and his argument on brief presented on the theory that the subsequent experience of petitioner

[2] SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT.

If any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the pupose of acquiring such property or which was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year (except as may be otherwise determined under section 269(b)) be allowed either the $25,000 exemption from surtax provided in section 11(c) or the $60,000 accumulated earnings credit provided in paragraph (2) or (3) of section 535(c), unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. * * *

after its formation disproves the reality of all other business purposes it then had and, by a process of elimination, leaves the Court in a position where it has no alternative but to decide that a major purpose for petitioner's creation was to secure the exemption and credit with which we are concerned.

It well may be and in fact it is demonstrated here that some of the stated reasons of Superior in incorporating petitioner were not well founded, but this does not nullify the existence of the reasons. We find that Superior's officers did believe many more employees would be required for the operation of petitioner than it developed in practice were actually required; that the officers' estimation of the amount and need for financing of the new corporation was in good faith even though experience later proved that no capital other than that initially furnished by Superior and through bank borrowing was necessary; that Superior did believe, at the time of petitioner's creation, that there was a distinct difference in the merchandising methods required for the wholesaling of meats as distinguished from frozen foods even though it afterward became apparent that the difference was relatively minor and Superior's officers did believe its handling and sale of display cases and cabinets would present a more difficult and risky phase of frozen food business requiring considerably more capital than proved to be the case.

Respondent argues strongly for his position because of a letter written by Superior's secretary to respondent's agent May 26, 1956, setting forth the secretary's reasons for petitioner's incorporation. It is true that some of the reasons there stated are not wholly true, but this evidence may at most be taken as a statement by an individual of his understanding of those reasons given some years after petitioner's inception and for the purpose of avoiding an income tax controversy. The writer has inexcusably exaggerated the factors underlying the reasons for petitioner's creation, but this can do no more than influence the weight to be given his oral testimony which is a part of the record in this case. We have taken into consideration the statements made in the letter in making our findings of fact.

Cases cited on brief by respondent are not sufficiently factually close to the case at bar to be of aid to us and we therefore do not discuss them.

*Decision will be entered under Rule 50.*