CRONSTROMS MANUFACTURING, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
CRONSTROMS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 73893, 73894. Filed June 9, 1961.

*Maynard B. Hasselquist, Esq.*, and *Paul G. Zerby, Esq.*, for the petitioners.

*Joseph D. Skinner, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined deficiencies in income tax against the petitioners, as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 73893 | Cronstroms Manufacturing, Inc. | 1954 | $5,500.00 |
| 73894 | Cronstroms, Inc. | 1954 | 395.49 |

The cases were consolidated for trial.

The sole issue for decision, which is common to both cases, is whether each of the petitioners has established by a clear preponderance of the evidence (as provided in section 1551 of the 1954 Code), that the transfer of property to it by another corporation at the time of the petitioners' formation was not made with a major purpose of securing the exemption from surtax provided by section 11(c) of the 1954 Code.

Another issue raised by the pleadings in Docket No. 73894, relating to the deduction for depreciation, was conceded by counsel for the petitioner in the course of his opening statement at the trial herein.

### FINDINGS OF FACT.

Some of the facts were stipulated. The stipulations of facts, together with the exhibits identified therein, are incorporated herein by reference.

Each of the petitioners, Cronstroms Manufacturing, Inc., and Cronstroms, Inc., is a corporation organized under the laws of the State of Minnesota, and having its principal office in Minneapolis. Each filed its Federal income tax return for the taxable calendar year 1954 here involved, with the district director of internal revenue for the district of Minnesota.

Cronstroms Heating and Sheet Metal, Inc. (hereinafter called the Heating and Metal corporation), was originally organized as a Minnesota corporation in 1926, under the name "System Credit Service, Inc." Thereafter its original business was terminated. It was reactivated on January 1, 1946, under the name which it presently bears, with 100 shares of authorized, issued, and outstanding common stock (the only type of stock it had). Ninety-eight of these shares were issued to Kenneth A. Cronstrom, its president; and the remaining 2 shares were issued in the name of the vice president and of the secretary, respectively. Thereafter, up to and including January 1, 1954, an additional 3,900 shares of the Heating and Metal corporation's common stock were authorized and issued to said president.

From 1946 to 1948, the Heating and Metal corporation was engaged in the business of selling, installing, and servicing furnaces, air-conditioning and ventilating equipment, and also doing sheet metalwork in the city of Minneapolis and its environs. Its customers were building contractors and homeowners in said Minneapolis area.

In the latter part of 1947, when aluminum was in plentiful supply, this corporation's president decided to inaugurate a manufacturing operation. He designed a portable aluminum picnic cooler, which the corporation in 1948 began to manufacture and to sell to distributors throughout the United States and in some foreign countries. At about the same time, the corporation began the manufacture of such aluminum products as steak broilers and toy toboggans. In 1948, the foregoing manufacturing operations were on a relatively minor scale, as compared to the other activities of the corporation.

By April 17, 1950, this corporation had decided to go into manufacturing on a somewhat larger scale, and on that date it hired an individual named C. E. Porter, who had had long experience in the production of aluminum products, to manage its aluminum-manufacturing operations.

Thereafter in June 1950, this corporation moved its heating and ventilating business to a new location, at 4410 Excelsior Boulevard, in the St. Louis Park area of Minneapolis. Robert Peterson, who had been connected with the company since 1946, was made manager of the heating and ventilating division, and devoted all of his time to his managerial duties. The manufacturing division continued to be located at 4225 Hiawatha Avenue in Minneapolis.

From 1950 through 1953, such corporation continued to sell and service heating and ventilating equipment. During the same period, it also continued to engage in the manufacture and sale of the above-mentioned picnic cooler; and it also added to its line such products as aluminum siding, steel bridging, office equipment, egg crates, and other miscellaneous articles.

Sales of this corporation's heating and ventilating division and of its manufacturing division, for each of the years 1948 through 1953, were as follows:

| Year | Heating and ventilating | Manufacturing |
|---|---|---|
| 1948 | $1,123,833.59 | $213,379.11 |
| 1949 | 939,489.72 | 253,449.25 |
| 1950 | 1,242,473.03 | 564,009.98 |
| 1951 | 1,199,852.71 | 1,070,613.81 |
| 1952 | 1,161,276.97 | 1,255,942.38 |
| 1953 | 1,302,556.82 | 1,555,325.94 |

After the hiring of Porter as manager of the manufacturing division, various changes were made in that division. In addition to the securing of separate buildings for its operations and those of the heating and ventilating division, new personnel were hired for the manufacturing division; new machinery was purchased for its use; and additions were built to its plant in order to provide more space.

Also, after Porter was hired, friction arose between him and Peterson, the manager of the heating and ventilating division. Each of these men felt that his division's showing as to profits was not as good as it should have been, due to his division being compelled to bear expenses which the manager thought had nothing to do with the operations thereof. For example, on several occasions there were arguments between Porter and Peterson as to the allocation of administrative and advertising expenses between the two divisions. Porter, in particular, was dissatisfied with the allocation of expenses for local advertising by the heating and ventilating division, because he felt that the market for his division's manufactured products was the wholesale distributor, rather than the local consumer at whom the above-mentioned local advertising was aimed.

The labor forces of the two divisions were dissimilar. The employees in the manufacturing division were mostly machine operators who did not require any special skills; whereas those in the heating and ventilating division were skilled craftsmen in the heating and sheet metal field. Prior to the separation of the two divisions into separate buildings in 1950, the dissimilarity of the labor forces led to friction and disruptions of work. In addition, a strike by employees of the heating and ventilating division in 1949 forced a complete shutdown of the entire plant for a period of 5½ weeks.

This Heating and Metal corporation was on occasion threatened with lawsuits, as the result of explosions of oil or gas furnaces which had been installed by the heating and ventilating division. The president of said corporation was concerned that if one of these lawsuits were actually filed and then lost, the judgment creditor might garnishee the corporation's bank account, and thus hamper the operations

of the manufacturing division as well as those of the heating and ventilating division.

During the years 1949 to 1953, said corporation, in addition to engaging in the types of business above described, also leased certain real properties which it owned. At the Hiawatha Street property, it leased a portion of the space in the company's building to a restaurant; and it also leased an adjacent lot to a frozen custard drive-in. Also in the new building erected on Excelsior Boulevard, the corporation leased space to a food brokerage firm, to an automobile dealer, and to a concern which manufactured badges. The corporation's rental income for the years 1949 through 1953, was as follows:

| Year | Amount of rental income |
|---|---|
| 1949 | $3,000.00 |
| 1950 | 7,876.69 |
| 1951 | 7,313.35 |
| 1952 | 10,799.97 |
| 1953 | 12,699.96 |

At some time in or after 1950, the president of the Heating and Metal corporation began to be concerned about making provision for his family and himself, for the period after his retirement from the business or after his death. He was married and the father of two married daughters. Neither his wife nor their daughters had ever taken an active part in the corporation's business; and the president did not believe that they were qualified to do so. Also, neither of his sons-in-law had ever taken any part, or shown any interest, in said business. At about this same time, the division managers, Porter and Peterson, had broached to the president the question of their purchasing the business when the president died, or whenever he might decide to sell his stock. The president was sympathetic with the managers' desires, but he did not believe that they could raise sufficient funds to make the purchase, so long as the corporation continued to have large amounts invested in land and buildings. To accomplish the dual objectives of providing for his family, and of facilitating the purchase of his interest by the division managers, the president gave consideration to the advisability of transferring all the land and buildings to a new corporation. His opinion was that the rental of these properties would provide a good source of income for his family, and that the rental activity could be handled for the contemplated new corporation by a real estate firm, without the necessity of any managerial activities by his wife, daughters, or sons-in-law.

On December 2, 1952, the Heating and Metal corporation established an employees' pension and profit-sharing trust; and one of the objectives in establishing this was to enable Porter and Peterson, as well as other employees, to ultimately gain control of the Heating and Metal corporation by purchase of its president's stock through

use of the assets accumulated in the above-mentioned trust. The employer's contributions to the trust were determined under a formula, based on the employer's net income of each year.

Thereafter, Porter, the manager of the manufacturing division, became dissatisfied with the trust plan. He felt that his division was rapidly increasing its business; whereas on the other hand, he believed that the heating and ventilating division would become a relatively less important segment—with the result that profits of the manufacturing division would constitute the bulk of the employer's contributions to the trust.

Over a period of years, the president gave consideration to the possibility of segregating into separate corporations: (1) The heating and ventilating phase of the business; (2) the manufacturing phase of the business; and (3) the ownership of the land and buildings. He thought that such plan might result in greater efficiency, and in providing a solution to the above-described management problems and frictions, and also a solution to his own problem of making provision for himself and his family. He discussed the matter with the division managers, Porter and Peterson. Porter was strongly in favor of the plan; and he threatened to resign if the proposed segregation procedures were not effected.

At a meeting of the Heating and Metal corporation's board of directors on October 23, 1953, it was decided to segregate said company's business into three separate corporations, as of January 1, 1954.

On December 29, 1953, the two petitioner corporations, Cronstroms Manufacturing, Inc., and Cronstroms, Inc., were organized. Thereafter, at a meeting of the board of directors of the Heating and Metal corporation, held on January 4, 1954, the president of said corporation was directed to present a formal plan of reorganization. Such a plan was thereafter presented and adopted at a special meeting of the board of directors on January 11, 1954.

Shortly thereafter but as of January 1, 1954, and pursuant to the above-mentioned plan of reorganization, petitioner Cronstroms Manufacturing, Inc., acquired from the Heating and Metal corporation, the assets (exclusive of land and buildings) of the latter's manufacturing division, and also assumed the liabilities of said division. In exchange therefor, this petitioner, further acting within the plan, issued 1,881 shares of its common stock (being all of its issued and outstanding shares) to Kenneth A. Cronstrom, president of said Heating and Metal corporation.

At about this same time, and also pursuant to the above-mentioned plan of reorganization, petitioner Cronstroms, Inc., acquired from the Heating and Metal corporation, the latter's land, buildings, and rental properties; and it also assumed the liabilities related to such properties. In exchange therefor, this petitioner issued, pursuant

to the plan, 1,293 shares of its common stock (being all of its issued and outstanding shares) to the said Kenneth A. Cronstrom. The net result of the foregoing transfers to the two petitioners, was to leave the Heating and Metal corporation with only the assets (other than land and buildings) and the liabilities of its heating and ventilating division.

In connection with the above-described transfers to the petitioner corporations, neither the president, the attorney, or the accountant of the Heating and Metal corporation, nor either of the above-mentioned division managers thereof (Porter and Peterson) gave any consideration to the matter of surtax exemptions provided by the then effective section 15(b) of the Internal Revenue Code of 1939; nor did they give any consideration to the possible provisions of the 1954 Code which had not yet been enacted.

Each of the petitioner corporations, on its Federal income tax return for the taxable year 1954 here involved, computed its tax liability by claiming the surtax exemption provided by section 11(c) of the 1954 Code. The respondent, in his statutory notices of deficiency herein, determined that neither of the petitioners was entitled to the benefit of said exemption from surtax.

### ULTIMATE FINDING.

The transfers to the petitioner corporations were not made with a major purpose of securing exemptions from surtax for said corporations.

### OPINION.

Section 1551 of the 1954 Code, which is the governing statute in the instant case, provides as follows:

SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT.

If any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or which was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year (except as may be otherwise determined under section 269(b)) be allowed either the $25,000 exemption from surtax provided in section 11(c) * * *, unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. For purposes of this section, control means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of the corporation. * * *

It is manifest, and the petitioner corporations do not dispute the fact, that each of them was created to acquire the properties which were in fact transferred to it by the Heating and Metal corporation. Also, there is no question that Kenneth A. Cronstrom, sole stockholder (with the exception of two qualifying shares) of the transferor, was solely in control of each of the petitioner corporations after the transfers. In these circumstances, the above-quoted section is applicable; and the petitioners are to be denied the benefit of the surtax exemptions provided in section 11(c), *unless* they have established herein, by the clear preponderance of the evidence, that the securing of such exemptions was not a major purpose of the transfers of property to them. See in this connection, *Coastal Oil Storage Co.*, 25 T.C. 1304, 1309–1310, reversed on another issue 242 F. 2d 396 (C.A. 4). We have held, in earlier cases, that this presents a factual question, which is to be determined upon a consideration of all the circumstances relevant to the transfers. *Truck Terminals, Inc.*, 33 T.C. 876, 884; *Sno-Frost, Inc.*, 31 T.C. 1058, 1062, acq. 1959-2 C.B. 7; sec. 1.1551–1(e) Income Tax Regs.

The interdicted purpose of securing the surtax exemption need not be the sole or principal purpose of the transfer. Rather, the benefit of the exemption is to be disallowed if such purpose was a *major* purpose. *Truck Terminals, Inc., supra*. Nor will a showing that business needs actuated the transfer, suffice to satisfy a taxpayer's burden of proof under section 1551. In a word, the taxpayer has the burden of establishing a negative proposition, i.e., that the securing of the surtax exemption was not a major purpose of the transfer.

Applying the foregoing criteria to the facts established by the record in the instant case, we are satisfied, and have found as an ultimate fact, that the transfers to the petitioners were not made with a major purpose of securing surtax exemptions. Petitioners have satisfied us that there were a host of purposes for these transfers; and these purposes have been set forth in our Findings of Fact. Not one of these purposes has the remotest connection with securing the surtax exemption provided in section 11(c). And, what is even more important, we are satisfied after seeing the several witnesses, and hearing their testimony, that the securing of such exemptions never entered into the thinking of those responsible for the reorganization, and in no way motivated either the creation of the petitioners or the transfers of the properties to them. Thus, the securing of surtax exemption was not a purpose at all.

We hold for the petitioners on this issue.

*Decisions will be entered under Rule 50.*