Midwest Metal Stamping Co., Inc., formerly Midwest Mower Corporation, a corporation v. Commissioner. Grass Queen Mower Corporation v. Commissioner.
Midwest Metal Stamping Co. v. Commissioner
Docket Nos. 792-64, 793-64.
United States Tax Court
T.C. Memo 1965-279; 1965 Tax Ct. Memo LEXIS 52; 24 T.C.M. (CCH) 1533; T.C.M. (RIA) 65279; October 21, 1965
*52 Martin A. Rosenberg, 1724 Arcade Bldg., St. Louis, Mo., for the petitioners. James F. Kennedy, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined the following deficiencies in income tax: Fiscal Year
Docket
Ending
No.
Petitioner
9/30
Deficiency
792-64
Midwest Metal Stamping Co., Inc., formerly Mid-
west Mower Corporation, a corporation
1957
$2,423.65
1958
4,943.61
Fiscal Year
Ending
793-64
Grass Queen Mower Corporation
1958
$3,393.77
1959
5,076.11
1960
909.60
1961
1,721.08
These cases were consolidated for trial. The issues in Docket No. 792-64 (Midwest Metal Stamping Co., Inc., formerly Midwest Mower Corporation, a corporation) are (1) whether the cost of a water sprinkler system is deductible as an ordinary and necessary business expense or must be treated as a capital expenditure; (2) whether the corporate petitioner is entitled to deduct certain amounts as advertising expenses; (3) whether the corporation is entitled to deduct certain purported royalty expenses as ordinary and necessary business expenses and (4) whether the corporate petitioner understated its gross income for the fiscal year ended September 30, 1960 by overstating its cost of goods *53 sold for that fiscal year in the amount of $103,833.36. The net operating loss for the fiscal year ended September 30, 1960, as here determined, is available as a net operating loss carry-back to the fiscal year ended September 30, 1957. The sole issue in Docket No. 793-64 (Grass Queen Mower Corporation) is whether the respondent correctly disallowed the surtax exemption (as defined in section 11(c) of the Internal Revenue Code of 1954) under the provisions of section 1551 of the Internal Revenue Code of 1954. [1]
Findings of Fact Some of the facts were stipulated and they are so found. Midwest Metal Stamping Co., Inc., formerly Midwest Mower Corporation, a corporation, hereinafter called Midwest, is a corporation organized under the laws of Missouri, with its principal office in St. Louis, Missouri, during the years at issue. Midwest filed its Federal income tax returns for the taxable years ending September 30, 1956 through 1960 on an accrual method of accounting with the district director of internal revenue, St. Louis, Missouri. Grass Queen Mower Corporation, hereinafter called Grass *54 Queen, is a corporation organized under the laws of Nevada, with its principal office in St. Louis, Missouri, during the years at issue. Grass Queen filed its Federal income tax returns for the taxable years ended March 31, 1958 through 1961 on an accrual method of accounting with the district director of internal revenue, St. Louis, Missouri. O. S. Rudman was president of Midwest and Grass Queen during the taxable years here relevant. From 1946 to 1961 Midwest was engaged in the manufacture of garden equipment, including chain saws, tillers and power mowers. In 1961 or 1962 Midwest changed its name to Midwest Metal Stamping and at the time of the trial was no longer engaged in the manufacture of garden equipment. To meet certain business needs, Midwest formed two sales corporations in February 1957, Grass Queen Mower Corporation, mentioned above, and Ever-Sharp Lawn Mower Corporation. Midwest owned all of the stock of Grass Queen and had complete control of its operations during all of the years at issue. Midwest continued to manufacture the mowers, with the sales handled by the two sales corporations. On occasion, the two sales corporations purchased mower accessories, such as snow *55 plows, from outside companies. Subsequently to February 1957, Midwest itself continued to sell mowers to at least two different retailers. Respondent, in his statutory notice of deficiency in Docket No. 793-64 (Grass Queen), determined that the surtax exemption claimed by Grass Queen for each of the fiscal years ended March 31, 1958 through 1961 was not allowable under the provisions of sections 269(a) and 1551 because Midwest had transferred cash and assets to Grass Queen "for the purpose of obtaining an additional surtax exemption." On May 1, 1954 Midwest leased a factory building in Hannibal, Missouri, from the R.B.S. Real Estate Co., a partnership consisting of Harry A. Bobroff, Ben Suffian and O. S. Rudman. Suffian is Rudman's brother-in-law. Each of the partners then owned a one-third interest in the building. On February 1, 1956 Rudman and Suffian purchased Bobroff's interest in the factory building. At the time the lease was executed Bobroff, as well as Rudman, was a stockholder of Midwest. The term of the lease on the factory building was for four years, from May 1, 1954 to April 30, 1958. R.B.S. Real Estate Co. leased the land where the factory was located from the C.B. & *56 Q. Railroad. The lease on the land expired April 30, 1958, and R.B.S. Real Estate Co. had an option to renew the lease for an additional 15 years. Midwest remained in the factory building in Hannibal, Missouri, until 1960 and Durasteel, a subsidiary of Midwest, continued to use the building until 1961. On September 1, 1954, Midwest executed an agreement with the St. Louis Automatic Sprinkler Co., Inc. for the installation of a fire sprinkler system in the factory building at Hannibal for the amount of $24,540. The agreement provided, in part, as follows: 15. The Buyer shall lease the system and pay as rental the sum of $24,540.00, said sum payable in equal annual installments of $4,090.00 each, the first payment of $4,090.00 to be made when the materials are delivered at the site of the job as above set out by Seller and the work of installation of said system shall be commenced, and each subsequent annual installment of $4,090.00 payable in advance on the anniversary date of the first payment until the full amount shall have been paid. Any default in the payments due under this contract by the Buyer as the same become due and payable the Seller may elect to collect by suit or otherwise *57 the entire amount then due as rental hereunder without first exercising its right of repossession of the material and equipment and system as hereinbefore set forth and any expense of bringing action or costs of court including a reasonable attorney's fee shall be paid by the Buyer. The Buyer shall hold Seller harmless against any and all actions, cause of actions, suits, claims or demand at law or in equity by any person or persons, firm or firms or association, partnerships or corporations whatsoever caused by any damages resulting from said system or any part thereof after the term of the Lease hereinabove set forth which shall be in addition to the terms of paragraph 5 hereof. Buyer may within ninety (90) days prior to the termination of this Lease have the option to renew same under terms to be negotiated during said time but nothing herein contained shall compel Seller to remove said materials, equipment or system from said building. 16. Whenever the term "Seller" is used in this contract it shall be construed to mean "Lessor" and whenever the term "Buyer" is used herein it shall be construed to mean "Lessee". Midwest deducted the amount of $4,090 paid in connection with the *58 fire sprinkler system as an ordinary and necessary expense on its returns for the fiscal years ended September 30, 1956 through 1959. Respondent disallowed these deductions on the ground that they represented capital expenditures made by Midwest. Respondent allowed a deduction of $944.03 in each of these fiscal years, as well as in the fiscal year ended September 30, 1960, as an amortization of the cost of the fire sprinkler system. On February 20, 1954 Midwest executed an agreement with Ride-A-Mower Company (a Connecticut corporation) under which Midwest acquired certain assets, tangible and intangible, including rights under a patent for a power mower and tractor, as well as jigs, fixtures, dies patterns, and other machinery and equipment used in manufacturing the power mower and tractor. Midwest agreed in subsection 3(b) of the agreement to pay quarterly to Ride-A-Mower Company "the sum of $5.00 per complete Ride-A-Mower unit manufactured and sold" by Midwest, reduced by certain outstanding obligations under the patent to the original inventor. Midwest also warranted in subsection 3(b) of the agreement "that it will make a minimum payment based upon 1,000 units in the period ending *59 with December 31, 1955 and minimum payment based on 1,000 units for each full year 1956, 1957, 1958, and 1959." Section 4 of the agreement provided that the amounts under subsection 3(b) "shall be payable within thirty (30) days of the close of each three (3) months period." Section 5 provides that within 30 days after the end of each three months period Midwest shall deliver to Ride-A-Mower Company a statement of Midwest's sales for the period and "the amount, if any, due [Ride-A-Mower] under said Article 3; the payment, if any be due, shall accompany each statement." Ride-A-Mower Company assigned to Detroit Controls Corporation the amounts due from Midwest under the February 20, 1954 agreement. Detroit Controls Corporation was a wholly-owned subsidiary of American Radiator and Standard Sanitary Company prior to June 20, 1957, on which date it was liquidated by the parent corporation which assumed all the rights and liabilities of the subsidiary. During the years here relevant the only payments made by Midwest under the February 20, 1954 agreement were based on the number of mowers sold. On its books Midwest treated as an accrued item the difference between the amount actually paid *60 and the total amount due under the minimum payment requirement. The amounts that were accrued have never been paid and at the time of trial these accruals had, been written off on its books by Midwest. Midwest stopped the manufacture and sale of this particular mower after the close of its 1957-1958 selling season. Midwest claimed a deduction as a royalty expense on its Federal income tax returns for the fiscal years ended September 30, 1957 and 1958 for the amounts accrued on its books under the February 20, 1954 agreement. Respondent disallowed these deductions in the amounts of $1,010 and $4,654 in the fiscal years ended September 30, 1957 and 1958, with the explanation that Midwest had not established these amounts were ordinary and necessary business expenses or were expended for the purpose designated. In January 1959 Midwest acquired all of the stock of Durasteel Company, which had been incorporated on January 12, 1959 to go into the parts and fabrication business. As a result of an automobile accident in the fiscal year ended September 30, 1960 involving Midwest employees in a company car, a judgment of $185,000 was obtained against Midwest. Consequently, in order to prevent *61 any interruption of Midwest's manufacturing operations as a result of any levy against Midwest, it was decided to lease the Midwest equipment to Durasteel Company, and about February 1960 the inventory and employees of Midwest were transferred to Durasteel Company. Rudman was president of Durasteel Company in 1960. The inventory of Midwest had been located in its factory in Hannibal, Missouri, and its factory in Syracuse, New York. At the time of the transfer an inventory was made of the finished products and engines, but no inventory was made at that time of work in progress or parts in stock. In April or May 1960 a flood ruined some of the inventory in the Durasteel Company's factory in Hannibal, Missouri. No determination was then made of the extent of the ruined inventory. Durasteel Company maintained its books and records on a calendar year basis. A physical inventory was made of the Durasteel Company's inventory in both plants as of December 31, 1960 and was valued at $982,956.50. Midwest, in computing its income for the fiscal year ending September 30, 1960, used a closing inventory as of that date in the amount of $341,338.19, which represented the estimated value of the total *62 inventory which had been transferred earlier in that year by Midwest to Durasteel Company. Respondent, in his statutory notice of deficiency, determined that Midwest understated its closing inventory as of September 30, 1960 by the amount of $103,833.36 and, through such understatement, had overstated its cost of goods sold for that fiscal year. This adjustment made by respondent decreased the net operating loss which had been reported by Midwest in its return for the fiscal year ended September 30, 1960. Opinion The first issue is whether respondent correctly determined that Grass Queen was not entitled to the surtax exemption (section 11(c)) in its fiscal years ended March 31, 1958 through 1961 because of the provisions of section 1551. This section provides that "[if] any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or which was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the *63 taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year * * * be allowed * * * the $25,000 exemption from surtax provided in section 11(c) * * * unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer." In Hiawatha Home Builders, Inc., 36 T.C. 491, 498, we stated that the "interdicted purpose of securing the surtax exemption need not be the sole or principal purpose of the transfer of property" but, instead, "the benefit of the exemption is to be disallowed if such purpose was a major purpose." A taxpayer does not meet his burden under the statute by merely showing that business needs prompted the transfer. As we indicated in Cronstroms Manufacturing, Inc., 36 T.C. 500, 506, "the taxpayer has the burden of establishing a negative proposition, i.e., that the securing of the surtax exemption was not a major purpose of the transfer." We are satisfied, on this record, that the transfer of property by Midwest to Grass Queen early in 1957 was not made with a major purpose of obtaining surtax exemptions. Instead, *64 the transfer was made to solve certain business problems which had confronted Midwest. Over the years Midwest sold its products to department stores, chain stores, mail order houses, and through jobbers and wholesalers. Prior to 1957 Midwest, in its mower sales, sold the same basic model to the different categories of customers, changing only the brand name and the color of the product. When the product was sold to jobbers and wholesalers, it was sold under the trade name "Eversharp", while it was sold to retailers under the trade name "Grass Queen". Prior to 1957 Midwest had encountered sales resistance from wholesalers because they were, in effect, competing with Midwest in the sales of mowers to retailers. During this period Midwest also had mechanical difficulties with some of the models it manufactured, and it was desired to separate these service problems from the manufacturing activities of Midwest. Midwest took several steps to eliminate these difficulties. It engaged a designer who redesigned a new model mower, with different specifications, for the wholesalers and jobbers. Two sales corporations were also formed in February 1957, the Ever-Sharp Lawn Mower Corporation and *65 Grass Queen. Midwest transferred $500 in cash and $1,500 in advertising materials to Grass Queen upon its incorporation in 1957 and also transferred the right to use the trade name "Grass Queen" to the corporation. Sales managers were employed to work with the different customer groups and basically different methods were used by the managers in making their sales to their respective groups. Rudman testified that after the sales corporations were formed there was, generally, nothing in the sales literature to associate them with Midwest. In short, as Rudman testified, "we wanted a complete disassociation" and "we felt it was the only way in which we could avoid this sales resistance and also overcome the problems that we had in mechanical deficiencies in the field, service problems that were laid at the door step of Midwest naturally." We are also satisfied from the record that Rudman had decided to form the sales corporations prior to any consideration of the tax benefits that would accompany such a decision. Respondent's witness, who was perfoming accounting services for Midwest in 1956, testified that he brought to Rudman's attention the possibility of a tax saving by forming the *66 subsidiaries, but he also testified that "[Rudman] made up his mind to form the corporations when I was called in." Under these circumstances, an awareness of the tax benefits did not amount, in our opinion, to a major purpose for the transfers. See Bush Hog Manufacturing Co., 42 T.C. 713, and Sno-Frost, Inc. 31 T.C. 1058. We find that the securing of the surtax exemption was not a major purpose of the transfer of property by Midwest to Grass Queen in 1957. We sustain petitioner, Grass Queen, on this issue. The next issue involves the payments made by Midwest under the purported lease of September 1, 1954 for the fire sprinkler system which was installed in the factory building at Hannibal, Missouri. Midwest contends that it merely leased the sprinkler system and that the annual payments of $4,090 are deductible as ordinary and necessary business expenses. In the alternative, Midwest argues that if we should find that the sprinkler system was purchased rather than leased, then Midwest (as lessee of the factory building) should be allowed to amortize its cost over the remaining period of the factory lease, which Midwest asserts expired on April 30, 1958. Respondent's position is *67 that under the September 1, 1954 agreement Midwest purchased the sprinkler system and that, since the lease on the factory building was for an indefinite period, the entire cost of the sprinkler system should be depreciated over its useful life. Respondent has allowed the amount of $944.03 [2] as a reasonable allowance for depreciation of the sprinkler system in each of the fiscal years here involved. Section 167(a)(1). Whether the September 1954 agreement represented a lease or an outright purchase of the sprinkler system is a question of fact which must be ascertained from the true intention of the parties as evidenced by the written instrument read in the light of the attending facts and circumstances at the time the agreement was executed. D. M. Haggard, 24 T.C. 1124, affd. 241 F. 2d 288. The president of the St. Louis Automatic Sprinkler *68 Co., Inc., George Cramer, testified that he considered the transaction as a sale, and that it was couched in the form of a lease only at Rudman's suggestion. Cramer was asked whether it was his understanding that this was a true lease and he replied "[well], frankly no." He further testified that his company did not ordinarily enter into lease agreements for its sprinkler systems and stated that "to my knowledge, this is the only one we ever sold on a lease basis." Here the sprinkler system was permanently affixed to the factory building and could not be removed without incurring substantial expenditures and perhaps damaging the building. Under the agreement, the St. Louis Automatic Sprinkler Co., Inc. retained title in the material and equipment, but this can be regarded as security for the deferred payments. Although the agreement provided that Midwest had the option to renew the purported lease within 90 days of its expiration (presumably September 1, 1959) "under terms to be negotiated during said time", it also provides that "nothing herein contained shall compel Seller to remove said materials, equipment or system from said building." When Durasteel (Midwest's successor) moved *69 out of the Hannibal factory building sometime in 1961, the sprinkler system was abandoned. Finally, it appears that the price of the sprinkler system on the basis of a cash sale was $20,450, and it would fairly appear that the total payments of $24,540 made by Midwest under the agreement merely represented the purchase price paid over a five year period. We conclude, upon an examination of the agreement and its attendant circumstances, that Midwest intended to purchase the fire sprinkler under the September 1, 1954 agreement and that the payments made by Midwest represented payments toward the total purchase price of such equipment. We feel that the subsequent acts of the parties with respect to this equipment are consistent with such an interpretation. We do not agree with Midwest's alternative argument that if the sprinkler system was purchased rather than leased, then it is depreciable over the then remaining period of the lease held by Midwest on the Hannibal factory building which, Midwest asserts, expired April 30, 1958. After that date Midwest remained in the building on a month-to-month basis. It is clearly established that where there is a reasonable certainty that the tenant *70 will continue in occupancy beyond the stated period of the lease, the lessee is a tenant for an indefinite duration and any improvements should be depreciated over their estimated useful life. G. W. Van Keppel Co. v. Commissioner, 295 F. 2d 767, affirming a Memorandum Opinion of this Court, and Kerr-Cochran, Inc., 30 T.C. 69. Even though the lease on the factory building in Hannibal was for a term of four years, from May 1, 1954 through April 30, 1958, we believe it was reasonably certain, from all the evidence, that the tenancy would continue for an indefinite period. The lessor of the building was the R.B.S. Real Estate Co., a partnership consisting of Rudman (president of Midwest), Rudman's brother-in-law, Ben Suffian, and Harry A. Bobroff, who each owned a one-third interest in the building. The building was on land leased from a railroad, and although this lease also terminated on April 30, 1958, the R.B.S. Real Estate Co. had an option to renew the lease for an additional 15 years. Bobroff, as well as Rudman, was a stockholder of Midwest. In February 1956 Rudman and Suffian purchased Bobroff's interest in the building. We are pursuaded that the relationship of these parties *71 and the proprietary interest of Rudman in Midwest would insure a continued occupancy by Midwest of the factory building after April 30, 1958 as long as it was advantageous, and, in fact, that is exactly what occurred. It was not until sometime in 1961 that Durasteel, a subsidiary of Midwest and its successor, moved out of the Hannibal building. It appears that the market for lawn mowers was deteriorating during this later period, and the record shows that Durasteel went into involuntary bankruptcy in February 1963. We are satisfied, on this record, that the tenancy was for an indefinite period and, accordingly, we agree with respondent that the fire sprinkler system was properly depreciable over its useful life. We have indicated earlier in the opinion the respondent's computation of the annual depreciation figure of $944.03 based on a remaining useful life (as of October 1, 1955) of 17.33 years. There is no evidence in the record to show the useful life of the sprinkler system was some lesser figure, and, consequently, we accept respondent's determination. We sustain respondent on this issue. The next issue is whether respondent properly disallowed certain advertising expense deductions *72 claimed by Midwest. On its returns for the fiscal years ended September 30, 1957 and 1958 Midwest claimed deductions for advertising expenses in the respective amounts of $22,752.91 and $14,530.21. In his statutory notice of deficiency the respondent disallowed advertising expense deductions in the amounts of $389.39 and $879.58 in the fiscal years ended September 30, 1957 and 1958, respectively, with the explanation that Midwest had not established that these amounts were ordinary and necessary business expenses or were expended for the purpose designated. Respondent's determination is presumptively correct, and Midwest has the burden of showing that it is entitled to these deductions. We do not believe that Midwest has met its burden. The only witness was Rudman, who did little more than to state that he knew of no reason for the disallowances. We sustain respondent on this issue. The next issue is whether Midwest is entitled to deductions for royalty expenses of $1,010 and $4,654 in the fiscal years ended September 30, 1957 and 1958 under its February 20, 1954 agreement with Ride-A-Mower Company. [3] Under subsection 3(b) of this agreement Midwest acquired rights under a patent for *73 a power mower and tractor and agreed to pay $5 for each unit manufactured and sold, with a minimum payment based upon 1,000 units. The agreement also provided that the amounts under subsection 3(b) were payable within 30 days of the close of each three months period, at which time Midwest was obligated to deliver a statement, together with payment, of any amounts due under subsection 3(b). The only royalty payments made by Midwest under this agreement were based upon mowers actually manufactured and sold. In the fiscal years ended September 30, 1957 and 1958 Midwest accrued on its books and claimed deductions for the amounts of $1,010 and $4,654, respectively, which represented the difference between the royalty payments actually made and the total amount due under the minimum payment requirement. These accrued amounts were never paid by Midwest and were subsequently written off its books. Midwest stopped the manufacture of this particular mower sometime in 1958 or 1959. It appears *74 from the record that Midwest did not include these accrued amounts in the three-months statements as amounts due Detroit Controls Corporation under the agreement. Rudman's only explanation for the failure to pay the accrued amounts was that "[we] didn't have the money." However, this is refuted by the financial statements of Midwest for this period which indicate sizable cash balances and substantial excess current assets over current liabilities as of September 30, 1957 and 1958. Moreover, Rudman admitted at the trial that he never told Detroit Controls Corporation that lack of funds prevented payment of these accrued amounts. Finally, we have also considered the somewhat equivocal testimony of an executive of American Radiator and Standard Sanitary Company (successor to Detroit Controls Corporation) as to this indebtedness of Midwest and it will suffice to say that we do not consider it very helpful in resolving the issue before us. We reach the conclusion, on the basis of the entire record, that Midwest did not admit its liability for the amounts accrued on its books and was prepared to resist payment of these amounts. It is well settled that an accrual basis taxpayer may not accrue *75 an unpaid expense item or a liability which is unsettled or contingent, or which the taxpayer is contesting. Security Flour Mills Co. v. Commissioner, 321 U.S. 281 and Dixie Pine Products Co. v. Commissioner, 320 U.S. 516. The case of General Communication Co., 33 T.C. 640, is particularly applicable here. We there denied a deduction for an accrued royalty liability on the ground that the taxpayer had neither admitted its liability for such royalty at the close of the taxable year nor had entered into negotiations for the settlement of such liability. We stated at page 654: Petitioner argues that in the absence of a previous denial of liability, such as by judicial contest or express repudiation, the requirement of admission is superfluous and unrealistic. We cannot agree. The taxpayer has the burden of proving that the asserted liability was in fact uncontested. The presence of an admission, express or implied, serves as direct proof that the taxpayer was not contesting liability. But absence of an admission, while not conclusive proof of a contest, certainly leaves a gap in petitioner's proof in the circumstances of this case. [n1] A taxpayer may resist payment of an asserted *76 claim in more subtle ways than express denial of liability or adoption of a litigious attitude. The facts of the instant case are an excellent example of this, for without evidencing express denial, they strongly indicate that petitioner intended to resist payment, in an effort either to compromise its liability or, if necessary, defend against it. * * * [Footnote 1 omitted.] We sustain the respondent on this issue. The next issue is whether the closing inventory of $341,338.19 as of September 30, 1960, which Midwest used in computing its income for that fiscal year was understated by the amount of $103,833.36. Such understatement would have the effect of increasing Midwest's cost of goods sold and, correspondingly, decreasing its reported income for that fiscal year. Midwest had transferred its inventory (finished products, work in process and parts in stock) to Durasteel, its wholly-owned subsidiary, about February 1960 in order to avoid a possible levy arising out of a judgment which had been obtained against Midwest. Durasteel then continued the manufacturing operations formerly carried on by Midwest. Midwest's closing inventory for purposes of computing its income for the fiscal *77 year ended September 30, 1960 was the inventory it had transferred to Durasteel. Unfortunately, Midwest had not taken an entire physical inventory at the time of the transfer. Rudman admitted that "[the] only inventory that was taken was of that which you could take very quickly, that would be finished goods and engines which are on pallets. There was no inventory taken of work in process and the thousands of items similar to that nature. " Sometime after September 30, 1960, Rudman supplied an estimated closing inventory figure of $341,338.19 to the accountant (Donald W. Huggins) who prepared Midwest's income tax return for the fiscal year ended September 30, 1960. A physical inventory was made of the Durasteel Company's inventory as of December 31, 1960 and was valued at $982,956.50. At the trial Huggins, a certified public accountant who for many years had Rudman as a client, as well as many of the Rudman enterprises, testified for the respondent that the above closing inventory of Durasteel Company indicated to him that the valuation placed on the closing inventory of Midwest as of September 30, 1960 had been incorrect. Huggins was familiar with the usual markups on the products *78 involved. Working backward from the closing inventory of Durasteel Company in the amount of $982,956.50, Huggins calculated that a more nearly accurate closing inventory valuation for Midwest as of September 30, 1959, would be approximately $507,000, indicating that the $341,338.19 valuation used by Midwest was about $166,000 too low. Rudman now testifies at this trady date that the closing inventory figure of Durasteel Company as of December 31, 1960 was too high. He admits that a physical inventory was then made, but claims that he failed to make any allowance for obsolescence at that time. His testimony on this point is somewhat ambiguous, since he testified that "[when] we took the inventory at the end of the year, we could have, at that time, taken the obsolescence factor into consideration, but I don't believe we did." At any rate, we have studied the evidence pertaining to this contention, including the testimony about some flood damage to inventory in April or May 1960, and we find it extremely vague and unconvincing. It will suffice to say that obsolescence is a question of fact which must be decided on all the evidence, First National Bank of Key West, 26 B.T.A. 370, and *79 we do not believe that Rudman's confusing and inconclusive testimony supports his obsolescence argument. Nor is there any other satisfactory evidence in the record to indicate that the closing inventory of Midwest as of September 30, 1960, was not underestimated by at least $103,833.36. We sustain respondent on this issue. Decision will be entered under 50 in Docket No. 792-64. Decision will be entered for the petitioner in Docket No. 793-64. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. Respondent deducted from $24,540, which was the total cost of the sprinkler system, the amount of $8,180 which Midwest had deducted as an expense in prior years, leaving an undepreciated cost of $16,360 as of October 1, 1955. Respondent then determined that this balance was depreciable over a remaining period of 17.33 years, or $944.03 per year.↩
3. Ride-A-Mower Company subsequently assigned to Detroit Controls Corporation (a subsidiary of American Radiator and Standard Sanitary Company) the amounts due from Midwest under the February 20, 1954 agreement.↩