JOHN E. CALBOM AND MELODIE CALBOM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Calbom v. Commissioner
Docket No. 9155-78
United States Tax Court
T.C. Memo 1981-95; 1981 Tax Ct. Memo LEXIS 651; 41 T.C.M. (CCH) 1009; T.C.M. (RIA) 81095; February 26, 1981. Thomas B. Tilford,Clay R. Randall,Patricia L. Murphy, for the petitioners. Wayne R. Appleman, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Year
Deficiency
1973
$ 10,269
1974
[1] 14,857
1975
2,614
The issues for determination are the following: (1) whether petitioner John E. Calbom sold or leased an interest in real property in 1974; (2) whether certain expenses incurred by petitioners in 1973, 1974 and 1975 were ordinary and necessary expenses incurred in a trade or business or in connection with the production of income; and (3) assuming petitioner *653 sold the real property in 1974, whether gain from the sale can be reported on the installment basis under section 453. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. John E. Calbom ("petitioner") and Melodie Calbom, [3] husband and wife, resided in Moses Lake, Washington, at the time they filed their petition in this case. Petitioner is an attorney who was admitted to the bar in 1950. In 1972 and 1973 petitioner devoted approximately 25 percent of his legal practice to real estate law. In April 1969 Anna Dills and her husband sold certain real estate (hereafter referred to as the "farm") situated in Grant County, Washington, [4] to Rollo and Elmer Griggs. Anna Dills and her husband owned and operated the farm prior to April 1969. [5] Despite the installment of a new irrigation system in 1970, the Griggs did a very poor job farming the property, and in 1971 they ceased farming it. In *654 early 1972 the Dills foreclosed on the farm and once again sought a purchaser for it. Shortly after this foreclosure William A. Walker agreed to purchase the farm for $ 110,000, paying $ 5,000 down with the balance to be paid no later than November 1, 1972. Walker failed to pay the balance of the pruchase price and only farmed the property to a limited degree in 1972 before vacating it. Petitioner began representing the Dills as their attorney sometime in the mid-1960's, and acted on their behalf in connection with the above sales and foreclosure. After Walker's failure to purchase the farm, petitioner and Anna Dills [6] agreed that petitioner would purchase the farm. Pursuant to a Real Estate Contract and Security Agreement dated November 24, 1972 (the "November 24, 1972 Contract"), petitioner purchased the farm for $ 90,000. The November 24, 1972 Contract required petitioner *655 to pay $ 2,500 down and accrued interest for the period December 30, 1972 to December 30, 1973, ($ 5,250) on January 10, 1973; petitioner was further required to pay $ 2,500 principal on December 30, 1973, and $ 1,500 principal plus accrued interest on each December 30th thereafter until retirement of the indebtedness. Interest was 6% per annum. Under the contract the Moses Lake Branch of the Seattle First National Bank acted as escrow agent and the Bank was to deliver the deed to petitioner only when the purchase price had been paid in full. Petitioner allocated the $ 90,000 purchase price as follows: $ 54,200 to improvements and other depreciable assets, and $ 35,800 to land. At the time petitioner acquired the farm it was run down and in need of substantial work. Some time around December 1, 1972, petitioner's daughter and son-in-law (Susan L. Reffett and Richard D. Reffett) moved into the house located on the farm. Richard D. Reffett ("Reffett"), a farmer by profession with experience farming in the Columbia Basin area, began at once repairing the house and revitalizing the property. In early 1973, Reffett, often with petitioner's help, domolished several buildings, redesigned *656 the existing irrigation system, burned weeds and otherwise made some new ground available to farming, carpeted parts of the house, repaired the furnace in the house, and added space heaters to the house. Reffett spent between $ 300 and $ 500 in redesigning the irrigation system. In addition, Calbom purchased (at a cost of $ 13,037) a new irrigation system (the "Lad Irrigation System") in an effort to bring certain dry land into irrigated farming. Petitioner and Reffett did not have an agreement in 1973 providing for a salary to Reffett or rental payments to petitioner. Reffett made a net profit of approximately $ 10,000 in 1973 from the sale of crops raised on the farm and from the sale of some cattle placed on the farm that year. Petitioner reported no income from the farm for 1973. Petitioner and the Reffetts treated 1973 as an experimental year in which to determine whether it was possible to raise sufficient crops on the farm to make it worth while to continue farming the land. On January 2, 1974, petitioner and the Reffetts executed and had notarized a document entitled "Agreement." Because the Agreement is the focal point of the dispute in this case, it is reproduced *657 here in full. THIS AGREEMENT, made this 2nd day of January, 1974 between JOHN E. CALBOM, Dealing in his separate property, hereafter called CALBOM, and RICHARD D. REFFETT and SUSAN L. REFFETT, husband and wife, hereafter called REFFETT. WITNESSETH: WHEREAS, CALBOM has this date made a gift to REFFETT of the land only described as follows: Farm Unit 230, Seventh Revision of Irrigation Block 41, Columbia Basin Project, as per plat recorded August 10, 1959, records of Grant County, Washington; AND the East half of the West half; the East half of the Southeast quarter; the Southwest quarter of the Northeast quarter all in Section 34, Township 20 North, Range 29 E.W.M., Grant County, Washington; EXCEPT that portion included in said Farm Unit 230. reserving to CALBOM all improvements thereon, more particularly described on Exhibit A and B hereto attached and made a part hereof by this reference and; WHEREAS, as a part of the transfer of the land from CALBOM to REFFETT, the parties have agreed that CALBOM shall lease the improvements above reserved to REFFETT and further, CALBOM shall share in appreciation in the event the land and improvements are sold; WHEREAS, *658 the parties have made miscellaneous agreements which they desire to reduce to writing herein. NOW, THEREFORE, for valuable considerations, the receipt of which is hereby acknowledged, both parties agree as follows: 1. CALBOM hereby leases to REFFETT for a term of six years commencing January 1, 1974 the improvements located on the above described real estate and more particularly described on Exhibits A and B hereto attached. REFFETT agrees to properly maintain and replace the improvements except those destroyed because of obsolescence and further to keep same fully insured and pay all taxes and assessments in connection therewith. In consideration of said lease, REFFETT shall pay CALBOM $ 500 per year on December 31 of each year commencing December 31, 1974. 2. In consideration of this transfer REFFETT agrees to pay all sums due Anna E. Dills, a widow, under the terms of the contract of sale between Anna E. Dills and John E. Calbom, dated November 24, 1972. In the event REFFETT fails to make said payments when due, CALBOM shall have the right, upon 30 days' notice to REFFETT, to terminate REFFETT'S interest in the Dills contract, if REFFETT does not cure *659 the default within said 30-day period. Reassignment of the Dills - Calbom contract from REFFETT to CALBOM is being held in escrow in the office of John E. Calbom and CALBOM is authorized to record said assignment in the event of default as aforesaid. 3. In 1973, a new sprinkler system was purchased from Lad Irrigation. It is understood that CALBOM has taken the investment credit and depreciation for 1973 on said sprinkler system. REFFETT shall be entitled to take the depreciation on said sprinkler system based on its depreciated value for the year 1974 and thereafter. 4. REFFETT agrees to promptly pay when due all real estate and personal property taxes, insurance premiums, irrigation assessments, and other items which may be a lien on the real estate or improvements herein described. 5. All hunting rights are hereby reserved by CALBOM. No hunting shall be allowed on the premises without the consent of CALBOM. REFFETT agrees to cooperate by restricting others from hunting without the permission of CALBOM. 6. It is understood that REFFETT wil personally occupy and farm the premises herein described. In the event REFFETT ceases to personally occupy and/or farm said *660 land, then same shall be placed for sale. Likewise, in the event REFFETTS cease living together said permises shall be listed for sale. In the event of sale, the net proceeds of the sale over and above $ 105,000 shall be divided equally between CALBOM and REFFETT. In the event of sale, it is understood that the improvements listed on Exhibit A and B shall be included in the sale together with any other improvements which REFFETT has placed on the premises, other than major improvements which CALBOM has agreed in writing, shall be considered solely the property of REFFETT. In computing the net sale price of $ 105,000, the balances owing on the Dills contract and the Lad Irrigation system acquired in 1973 or other encumbrances, shall not be deducted; only the costs of sale and transfer shall be deducted. [7]
*661 7. No partial sales of real estate shall be made unless both parties agree thereto. In the event partial sales are agreed to, the net amount derived from the sale shall be applied to reduce the contract balance due Anna E. Dills; but in the event the remainder of the farm is thereafter sold, then the net amount derived from partial sales shall be subtracted from the sum of $ 105,000 and that figure shall be used as a basis for dividing net sale proceeds equally between CALBOM and REFFETT. 8. It is understood that this Agreement shall continue indefinitely and the parties may mutually agree that the farm be sold subject to a division of funds as hereinbefore set forth. 9. At the time the lease from CALBOM to REFFETT on the improvements expires, the parties shall enter into a new lease or CALBOM shall have the option to make a gift of the improvements to REFFETT at depreciated value. 10. In the event of the demise of CALBOM, the lease of improvements shall terminate and title to the improvements shall vest in REFFETT. In the event of the demise of CALBOM, all rights of CALBOM to share in the proceeds of a future sale of all or a portion of the premises shall cease *662 and terminate. 11. In the event of the death of either one of the REFFETTS, the premises shall be listed for sale and the net sale proceeds shall be divided as herein above provided. 12. REFFETT hereby agrees to indemnify and hold CALBOM harmless from all claims or demands arising out of the use of the premises by REFFETT including, but not limited to, property damage, personal injury, or death. 13. In the event of the insolvency of REFFETT, or in the event of the filing of a bankruptcy proceeding, all rights of REFFETT in and to the land and improvements shall immediately cease and terminate and the contract with Anna E. Dills shall be reassigned to CALBOM forthwith. 15. [sic] This agreement is binding on the parties hereto, their heirs and executors; neither CALBOM nor REFFETT shall assign or transfer any interest herein without the consent of the other first obtained in writing. [Emphasis added.] Reffett purchased the Lad Irrigation System referred to in paragraph 3 of the Agreement from petitioner in 1974. Reffett paid for the system by taking over petitioner's indebtedness to the Seattle First National Bank of approximately $ 13,000. On January 2, 1974, petitioner *663 executed and had notarized a Purchaser's Assignment of Contract and Deed in which he conveyed and quit-claimed the farm to the Reffetts. Anna Dills executed a Consent to Agreement dated January 21, 1974, consenting to the assignment of the November 24, 1972 Contract to the Reffetts, provided such consent not be construed as a release of petitioner's obligations under the contract. Pursuant to paragraph 2 of the Agreement, on January 2, 1974, the Reffetts executed a Purchaser's Agreement of Contract and Deed reconveying the farm back to petitioner. Petitioner drafted the Agreement and all the other documents. None of these documents were ever recorded in any real property records or filed with the escrow agent under the November 24, 1972 Contract. Petitioner retained the originals of all these documents. Petitioner paid the $ 2,500 down payment and the $ 5,250 advanced interest due under the November 24, 1972 Contract. The Reffetts have made all subsequent payments of principal and interest due under the November 24, 1972 Contract. The value of the farm at the time of trial was approximately $ 315,000. Among other factors, Reffett's efforts contributed to this increase. *664 Petitioner included in farm income the following amounts and deducted the following farm expenses on his 1973, 1974 and 1975 income tax returns: 1973
1974
1975
Income (Total)
$ 0
[8] $ 625
[8] $ 605
Expenses: Depreciation
[9] 18,457
6,459
5,456
Taxes
[10] 1,458
0
0
Advertising
9
0
0
Repairs
312
0
0
Insurance
449
0
0
Utilities
46
0
0
Permits
0
10
60
Total
$ 20,731
$ 6,469
$ 5,516
During the years in issue petitioner did not include in income any of the principal and interest payments made on the November 24, 1972 Contract by the Reffetts pursuant to the Agreement. Similarly, *665 petitioner did not include in income any taxes, insurance or other payments made by the Reffetts in connection with the property. The Reffetts claimed on Schedule F (Farm Income and Expenses) of their 1974 and 1975 income tax returns deductions for interest, insurance and taxes, but did not claim any deductions for rent of the land or improvements. The interest portion of the payments under the November 24, 1972 Contract accounts for part of the interest deductions taken in those years. In 1973 the farm (both land and improvements) had an uncertain fair rental value. In 1974 and 1975 the farm had a fair rental value of $ 8,000 per year. In 1974 and 1975 the house had a fair rental value of $ 600 a year and the irrigation system had a fair rental value of $ 2,100 per year. In his statutory notice respondent disallowed petitioner's farm expenses taken in connection with renting the property for 1973, 1974 and 1975. Respondent also disallowed petitioner's depreciation expenses taken on the farm improvements in all three years. Alternatively, respondent dis-allowed the depreciation deduction in part because petitioner had not established a cost basis in the property in excess *666 of $ 2,500. This Court granted respondent's Motion for Leave to File Amendment to Answer. In his Amendment to Answer respondent increased petitioner's deficiency for the year 1974 from $ 2,047 to $ 14,857. Respondent bases this increased deficiency on the assertion that on January 2, 1974, petitioner sold the farm to the Reffetts and realized long-term capital gain equal to the excess of the amount realized ($ 87,500) [11] over petitioner's basis in the land ($ 35,800). OPINION The first issue is whether petitioner sold or leased an interest in the farm land and improvements in 1974. This issue requires us to determine the effect of the January 2, 1974 Agreement between petitioner and the Reffetts. Respondent views the Agreement as having two distinct parts: a sale of the farm land and a lease, without a profit motive, of the improvements. Petitioner, on the other hand, argues that he and the Reffetts entered into a "development lease" [12] pursuant to which the Reffetts leased both the land and improvements from *667 him and agreed to share in any appreciation in the farm on its sale. Generally the burden of proof in this Court is on the taxpayer "except as otherwise provided by statute or determined by the Court; and except that, in respect of any * * * increases in deficiency * * * pleaded in his answer, it shall be upon the respondent." Rule 142(a), Tax Court Rules of Practice and Procedure. Since the first issue derives directly from an increase in deficiency asserted by respondent in his amended answer, the burden of proving that petitioner sold the farm to the Reffetts is on respondent. The term "sale" is given its ordinary meaning for federal income tax purposes. A "sale" is generally *668 defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563, 570-571 (1965). Whether petitioner's transaction with the Reffetts is a sale or a lease is a question of fact which must be ascertained from the intention of the parties as evidenced by the written Agreement read in light of its attending facts and circumstances. Haggard v. Commissioner,24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). [13] Some of the factors which have been considered by courts in making this determination are: (1) whether legal title passes, Commissioner v. Segall,114 F.2d 706, 709 (6th Cir. 1940), cert. denied 313 U.S. 562 (1941); Oesterreich v. Commissioner,226 F.2d 798, 802 (9th Cir. 1955); (2) how the parties treat the transaction, Oesterreich v. Commissioner,supra at 803; (3) whether an equity was acquired in the property, Haggard v. Commissioner,241 F.2d 288, 289 (9th Cir. 1956); Oesterreich v. Commissioner,supra at 803; see Mathews v. Commissioner,61 T.C. 12, 21-23 (1973), *669 rev'd 520 F.2d 323 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976); (4) whether the contract creates a present obligation of the seller to execute and deliver a deed and a present obligation on the purchaser to make payments, Wiseman v. Scruggs,281 F.2d 900, 902 (10th Cir. 1960); (5) whether the right of possession is vested in the purchaser, Wiseman v. Scruggs,supra at 902; Commissioner v. Segall,supra at 709; (6) which party pays the property taxes, Harmston v. Commissioner,61 T.C. 216, 229 (1973), affd. 528 F.2d 55 (9th Cir. 1976); (7) which party bears the risk of loss or damage to the property, Harmston v. Commissioner,supra at 230; and (8) which party receives the profit from the operation and sale of the property, Harmston v. Commissioner,supra at 230. Using the above criteria as guideposts, we conclude that petitioner sold both his interest in the land and the improvements *670 to the Reffetts. Legal titie to the property remained tied up in the Anna Dills escrow; the Seattle First National Bank was to deliver the deed to the farm only after Anna Dills had been paid in full. Therefore petitioner did not have title to deliver to the Reffetts. He did, however, execute and have notarized a Purchaser's Assignment of Contract and Deed conveying and quit claiming the farm to the Reffetts. He also had Anna Dills sign a written consent to the assignment. As protection in case Reffett failed to make payments when due to Anna Dills, Reffett signed a reconveyance of the farm back to petitioner, which petitioner held in his office together with his conveyance of the farm to Reffett as security for Reffett's performance under the Agreement. The parties generally treated the arrangement on their income tax returns as a sale. The Reffetts filed a Schedule F (Farm Income and Expense) in 1974 and 1975 claiming deductions for interest (including interest paid on principal payments to Anna Dills), insurance and taxes and claimed depreciation, but claimed no deduction for rent paid for either the petitioner's land or improvements. Petitioner included as rent the $ *671 500 a year paid by the Reffetts in 1974 and 1975, but did not include any part of the Reffetts payments to Anna Dills. Petitioner, however, also claimed depreciation on farm improvements in 1974 and 1975. [14]
The Reffetts were acquiring an increasing equity in the farm with each principal payment they made on the Anna Dills contract. Under the Agreement the Reffetts were required to make these payments currently or they would lose the farm. Legal title was impliedly required to be made available to the Reffetts when Anna Dills was paid in full. Meanwhile, the Reffetts had possession and control of the land and were both living on it and farming it for their own benefit. The Reffetts were required to pay all real and personal property taxes, insurance premiums, and irrigation assessments. They agreed to indemnify and hold petitioner harmless from all claims arising from use of the property including property damage and personal injury. In case of a sale of the farm land and improvements, *672 the first $ 105,000 of sales proceeds was to be applied to pay off the remaining obligation under the Anna Dills purchase agreement and any amount still owing on the Lad Irrigation System; the residue was payable to the Reffetts. Any sales proceeds in excess of $ 105,000 were to be divided equally between the Reffetts and petitioner. There is no evidence indicating the source of the $ 105,000 figure. However, it is approximately the cost to the Reffetts of the farm land and improvements, including the Lad Irrigation System. We conclude that any additional amount payable to petitioner on the sale of the farm under this sharing arrangement represents additional sales proceeds from his sale of the farm to the Reffetts. Accordingly, we find that petitioner sold his entire interest in the farm to the Reffetts in 1974, that petitioner realized an amount equal to $ 87,500 (the amount of principal due on the Anna Dills contract) plus the fair market value of six annual payments of $ 500. We conclude that the appropriate discount rate for determining the fair market value at time of sale of the right to receive $ 500 a year for six years is 6 percent. In Re Steen, 509 F.2d 1398, 1405 (9th Cir. 1975). *673 Petitioner's basis for calculating gain on the sale is $ 90,000 less any deductions properly allowed (see infra). The sale in 1974 is an open transaction in as much as it is unknown when the farm will be sold or what amount petitioner will receive as his one-half the sale proceeds in excess of $ 105,000 on the sale of the farm by Reffett. The second issue is whether certain expenses incurred by petitioner in 1973, 1974 and 1975 were ordinary and necessary business expenses incurred in connection with the production of income. In 1974 and 1975 petitioner claimed deductions for depreciation and the cost of permits obtained in connection with the alleged rental of the improvements. The depreciation deductions are disallowed based on our holding that petitioner sold the improvements along with the land to the Reffetts in 1974 and, consequently, did not possess a depreciable interest in those improvements. Furthermore, petitioner is not entitled to deduct the permit fees under section 212 because he had transferred his entire interest in the farm and was entitled to receive only sales proceeds thereafter. The deductions claimed in 1973, however, warrant a different result. *674 Petitioner argues that he is entitled to depreciation deductions in 1973 under section 167, and that he is entitled to the other disallowed expenses under section 212. Respondent, on the other hand, argues that petitioner's deductions were not incurred in connection with an activity engaged in for profit. Accordingly, respondent argues that petitioner is limited to those deductions permitted under section 183(b). The parties have argued this issue within the framework of the question whether petitioner had a profit motive in his operation of the farm in 1973. Section 167 allows a reasonable depreciation deduction for the exhaustion, wear and tear of property held for the production of income. Section 212 permits a deduction for the ordinary and necessary expenses of the management, conservation or maintenance of property held for the production of income. The key question here is whether the property, in connection with which the deductions are claimed, was held in 1973 for the production of income. Section 1.212-1(b), Treas. Regs., provides: (b) The term "income" for the purpose of section 212 includes not merely income of the taxable year but also *675 income which the taxpayer has realized in a prior taxable year or may realize in subsequent taxable years; and is not confined to recurring income but applies as well to gains from the disposition of property. * * * Expenses paid or incurred in managing, conserving, or maintaining property held for investment may be deductible under section 212 even though the property is not currently productive and there is no likelihood that the property will be sold at a profit or will otherwise be productive of income and even though the property is held merely to minimize a loss with respect thereto. Petitioner acquired the farm in 1972 with a primary intent of making a profit on its resale. [15] At that time the farm had not been successfully operated for at least three years, was in a state of some disrepair, and it was uncertain whether it could be operated profitably. Petitioner had no background in farming and required assistance in operating the farm. Reffett, however, had considerable farming experience in the Columbia Basin area. In 1973 Reffett farmed the property on an experimental basis designed to determine whether the farm could be operated profitably. In exchange for Reffett's *676 efforts, petitioner allowed him to keep the profits from whatever crops and livestock he raised. In 1974, when it was clear that the farm could be operated at a profit, petitioner and the Reffetts entered into the Agreement. We are convinced that in light of the past history and state of disrepair of the farm in 1973, petitioner's transactions with Reffett in that year do not evince a lack of an intent to produce income from the farm. The expenses (including depreciation) associated with that endeavor were incurred with a view toward the production of future income and, accordingly, these deductions are allowable under section 167 and 212. Respondent takes the position that petitioner lacked a profit motive because: (1) petitioner had no farming experience and has owned no similar property; (2) petitioner made no effort to locate another renter for *677 the property; (3) the Reffetts made a profit from the farm in 1973; and (4) the farm had a fair rental value of $ 7,500 in 1973. [16]
Respondent asserts that because petitioner had no farming experience and never owned any similar property, petitioner could not have a profit motive in acquiring the farm. The federal tax law is not intended to discourage taxpayers from investing in property or projects which are new to them. Petitioner's lack of experience in farming should not be held against him. Respondent next claims that petitioner did not hold the farm in 1973 for the production of income because he failed to lease the property for its fair rental value. Under this theory, respondent claims that petitioner and Reffett entered into an oral lease for the year 1973 pursuant to which Reffett did not pay any rent. Respondent's position here is premised on his assumption that the farm had a fair rental value *678 in 1973 of $ 7,500. The farm needed significant work at the time the Reffetts took control of it. We find that, even if Reffett and petitioner entered into an oral lease, the services provided by Reffett in revitalizing the farm were adequate compensation for the fair rental value of the farm in 1973. Furthermore, we find that respondent's expert's testimony, although accurate for the most part, was not realistic regarding the fair rental value of the farm in 1973 in light of the farm's condition. Reffett's efforts in 1973 significantly upgraded the farm which had not been operated successfully for at least three years prior to his arrival. It is unlikely that petitioner could have located any farmer willing to put in the time and effort required by the farm and in addition pay $ 7,500 in rent or even a lesser amount. In fact, had Reffett paid $ 7,500 in rent as respondent argues he should have, his net profit from the farm would have been roughly $ 2,500 in 1973, an amount which is not commensurate with the efforts expended or risks taken by Reffett. The final issue is whether petitioner is entitled to recognize the gain from the sale of the farm on the installment basis *679 under section 453. [17] Since we have held that the sale of the farm by petitioner is an open transaction with an indefinite sales price, section 453 (as then in effect) [18] is unavailable to petitioner. In re Steen, 509 F.2d 1398 (9th Cir. 1975). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. In his statutory notice, respondent determined a 1974 deficiency of $ 2047, but in an amended answer respondent asserted a deficiency of $ 14,857.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue except as otherwise indicated.↩
3. Melodie Calbom is a petitioner solely by virtue of having filed a joint return with her husband.↩
4. The farm is located in an area also known as the Columbia Basin. ↩
5. The farm had been in the Dills family since about 1890. The Dills family farmed the property from that time until 1969.↩
6. Sometime after the sale to the Griggs and prior to November of 1972, Anna Dills' husband died.↩
7. The Agreement does not expressly provide for the allocation of the first $ 105,000, but petitioner's and Reffett's testimony establishes that the first $ 105,000 will retire any outstanding balance under the November 24, 1972 Contract and any outstanding balance due on the Lad Irrigation System. Any remaining amount up to $ 105,000 will then be allocated to the Reffetts.↩
8. These figures include the $ 500 payments from the Reffetts as required by the Agreement. The Reffetts did not, however, pay petitioner $ 500 in 1974 and 1975, but rather Reffett rendered services to petitioner in those years in lieu of such payments. The additional income is apparently attributable to the sale of a calf in each of the years. ↩
9. The $ 18,457 figure includes a demolition loss of $ 5,797. Petitioners concede that they are not entitled to the demolition loss. ↩
10. Respondent does not dispute the propriety of this deduction.↩
11. Respondent determined that the amount realized equaled the outstanding balance due from petitioner to Anna Dills under the November 24, 1972 Contract.↩
12. Petitioner did not argue that he and the Reffetts entered into a joint venture or partnership to develop the farm. Petitioner failed, both at trial and in his briefs, to adequately develop such a theory and the evidence presented does not support such a theory. In fact, with the exception of a reference characterizing the relationship between petitioner and the Reffetts as a "mutual venture" contained in his conclusion to his reply brief, petitioner completely ignored this alternative theory.↩
13. See also Midwest Metal Stamping Co., Inc. v. Commissioner,24 T.C.M. 1533↩, 34 P-H Memo. T.C. par. 65,279 at 1685 (1965).
14. We note that petitioner exhibited a certain awareness of the tax benefits of claiming depreciation and the investment credit in drafting the Agreement. See, for example, paragraphs 3 and 9.↩
15. Petitioner's decision to acquire the farm may have been colored by the fact that his daughter recently married Reffett, a farmer with experience in the same locality as that of the farm. This fact, however, in no way means that petitioner did not acquire the farm with a primary intent of making a profit from its resale.↩
16. In his statutory notice respondent also argued that petitioner failed to establish a cost basis in excess of $ 2,500, and thus petitioner's depreciation deductions were improper. It is clear from the trial and respondent's briefs that he has abandoned this claim.↩
17. This issue arises because petitioner was entitled to depreciation deductions in 1973 which reduced his basis in the property sold. ↩
18. Section 453 was amended by adding section 453(i)(2) which provides that the Secretary of the Treasury shall prescribe regulations "providing for ratable basis recovery in transactions where the gross profit or the total contract price (or both) cannot be readily ascertained." Installment Sales Revision Act of 1980, Pub. L. No. 96-471, section 2(a), 94 Stat. 2247.↩